**Charles BICE, Executor of the ESTATE OF Martha BICE, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 02–784C.**

United States Court of Federal Claims.

July 29, 2004.

Dr. Carl R. Robinson, Bessemer, Alabama, Counsel for Plaintiff.

J. Reid Prouty, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for the Defendant. With him on the briefs were David M. Cohen, Director, Franklin E. White, Jr., Assistant Director, and Peter D. Keisler, Assistant Attorney General.

Tahmineh I. Maloney, law clerk.

### *OPINION*

BASKIR, Judge.

Plaintiff, Charles Bice, widower and executor of the estate of Firefighter Martha Bice, brings this action appealing the final decision of the Bureau of Justice Assistance (BJA or Board), denying him survivor's benefits pursuant to the Public Safety Officers' Benefits Act (PSOBA), 42 U.S.C. § 3796, *et seq.* (1996). The PSOBA provides benefits to survivors of public safety officers who are killed "as a direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a) (1996). The parties have filed cross motions upon the administrative record.

Because we find that the BJA improperly disregarded evidence favorable to the Plaintiff, in violation of the applicable statute and regulations, and imposed evidentiary limitations unsupported by regulation or statute, we reverse the BJA's determination and remand this matter for reconsideration in light of this Court's ruling.

Much of the history of this case concerns the dispute between medical authorities as to what role, if any, carbon monoxide poisoning played in Firefighter Bice's death. In the end, however, the BJA decision did not choose between these "two theories." Instead its decision turned on the nature and sufficiency of the evidence supporting the Plaintiff's case. The Board improperly discounted the evidence of carbon monoxide inhalation as merely "circumstantial," noting the total lack of what it called "objective evidence"—either blood gas test results or an autopsy. Moreover, the BJA failed to give "substantial weight" to—indeed totally ignored—findings of the appropriate State and Federal investigative agencies, as required by statute.

## BACKGROUND

*The Fire*

On October 18, 1996, Firefighter Martha Bice fought a forest fire in Blount County, Alabama, as a member of the West Etowah Volunteer Fire Department, Altoona, Alabama. Consolidated Statement of Uncontroverted Facts (CSUF) ¶¶ 2–3; Administrative Record (AR), Vol. 1, Tab 26. She fought in heavy smoke for approximately 2 ½ hours before complaining of excess smoke inhalation, nausea, and chest pains. CSUF ¶ 3; *see also* AR Vol. 1, Tabs 6 & 17 (affidavits provided by Firefighter Terry Blakely, the Fire Chief of the Department, and Firefighter John D. Smith, the Assistant Fire Chief). Both firefighters stated that the group fought in "heavy smoke" before Firefighter Bice "complained of getting too much smoke, nausea and chest pain."

She was taken to Blount County Hospital where she was diagnosed as suffering from a myocardial infarction, in lay terms a heart attack. CSUF ¶ 4; American Heritage Dictionary (4th ed.2000). She was found to have pre-existing heart disease, the significance of which as a factor leading to her death became a matter of dispute between medical experts. CSUF ¶ 14. She had no knowledge of her pre-existing heart disease before her heart attack. CSUF ¶ 22. During the course of her treatment, she was airlifted to Baptist Medical Center, Birmingham, Alabama. CSUF ¶ 6.

Her initially unstable condition required the installation of a temporary pacemaker and cardiac support. AR, Vol. 1, Tab 6 (Discharge Summary). She also suffered from "respiratory failure and hemoptysis and pulmonary edema, requiring intubation and ventilation." In lay terms, pulmonary edema refers to excess fluid in the lungs, and hemoptysis to the "spitting up of blood derived from the lungs or from the bronchial tubes." The American Heritage *Stedman's* Medical Dictionary (1995).

Carbon monoxide is virtually always present in smoke. CSUF ¶¶ 5, 21. However, due to equipment malfunction, no analysis of Firefighter Bice's blood gases, including carbon monoxide levels, was performed at or about the time of her admission to the hospital. As a result, the precise amount of carbon monoxide, if any, present in her blood at the time of her admission cannot be "objectively" established.

The medical relationship between carbon monoxide exposure and heart disease is a complex one. We do not attempt to fully explain it. However, on the basis of the record we may conclude the following. Among other effects, carbon monoxide inhibits the supply of oxygen to the heart muscle. As a result, carbon monoxide poisoning makes a victim more vulnerable to heart attacks. As we will detail later, the Public Safety Officers' Benefits (PSOB) Program of the BJA has in the past denied benefits for deaths caused by heart attack, but awarded benefits when smoke or carbon monoxide poisoning is a contributory factor to a death. As a consequence, the PSOB Program adopted parameters based on the level of carbon monoxide found in blood gas tests of the kind not performed on Firefighter Bice.

*See* 43 Fed.Reg. 41,303 (Sept. 15, 1978) (meeting between five medical experts and the predecessor to the BJA).

On October 30, 1996, Firefighter Bice underwent a cardiac cathiterization with angiography. CSUF ¶ 7. On November 4, 1996, she was discharged. AR, Vol. 1, Tab 6 (Discharge Summary). She was sent home to recover and regain strength for her subsequent heart surgery. CSUF ¶ 8. Dr. Charles Colvin, III, her personal physician, signed off on Firefighter Bice's discharge summary. He also provided the Plaintiff with an affidavit in support of his claim, which we will later discuss.

*Firefighter Bice's Death*

On November 20, 1996, Firefighter Bice was readmitted to the Baptist Medical Center. AR, Vol 1, Tab 6. On November 22, she underwent a quadruple coronary bypass grafting procedure, which was performed by Dr. Duane Randleman. *Id.;* CSUF ¶ 15. "Coronary grafting is a surgical procedure meant to restore blood flow to a portion or portions of the heart that are distal to blocked arteries." CSUF ¶ 15. Dr. Randleman also provided the Plaintiff with an affidavit in support of his claim, which we subsequently discuss.

Firefighter Bice died on the second day following her heart surgery. CSUF ¶ 16. She was 59 years old. AR, Vol. 1, Tab 6. Her death certificate listed her immediate cause of death as heart failure, with an approximate interval of six weeks between the onset of her heart failure and her death. According to the death certificate, Firefighter Bice's death arose from her heart failure on October 18, 1996, rather than from her surgery on November 22, 1996. Coronary artery heart disease was listed as the underlying cause of her death, with an approximate interval of two months between its onset and her demise. An autopsy was not performed. CSUF ¶ 18. In addition to the absence of blood gas test results, the BJA cited an autopsy as a second type of "objective" evidence that was not available. AR, Vol. 1, Tab 37 (Second Final Decision).

On June 12, 1998, the State of Alabama awarded Charles Bice compensation in the amount of $50,000 for the death of his wife, pursuant to a state statute similar to the PSOBA. AR, Vol. 1, Tab 15; *see also* Code of Ala. § 36–30–1, *et seq.* The State Board of Adjustment found Mr. Bice entitled to an award because his wife was found to have died in the line of duty:

> pursuant to the following statement of facts submitted and proven by the Claimant: 'Martha Bice, Etowah County Volunteer Fire Department, died of heart failure following smoke inhalation at the scene of a fire.'

*See also* Code of Ala. § 36–30–1(a)(2) (compensation to be paid "on account of injury or death which occurred during the course of employment or activity as a...fireman").

Firefighter Bice was also accepted to the National Fallen Firefighters' Memorial in Emmitsburg, Maryland. AR, Vol. 1, Tab 23 (letter from Mr. Bice to the BJA, stating Mrs. Bice was accepted to the "National Fallen Fire Fighters (sic) Monument (sic) in Emmitsburg, Maryland"); *see also http://www.usfa.fema.gov* (describing the memorial and providing an on-line database of fallen firefighters). Congress has designated this memorial as the national Memorial to career and volunteer fallen firefighters who die in the line of duty. The database listed Firefighter Bice's cause of death as "stress/exertion," and the nature of death as "heart attack." Neither the Alabama award nor the memorial designation was addressed in the subsequent PSOB and BJA determinations.

Mr. Bice filed a claim for death benefits under the PSOBA on December 8, 1997. AR, Vol. 1, Tab 1. In support of his application, the West Etowah Volunteer Fire Department submitted a report on Firefighter Bice's death. AR, Vol. 1, Tab 2. The letter is incomplete in the record.

*AFIP Report # 1 and First Ruling*

The Armed Forces Institute of Pathology (AFIP) prepared a total of three reports for the PSOB Office, in order to aid in its determination of whether Mr. Bice was entitled to compensation under the statute. Dr. Lapa, Chief Deputy Medical Examiner, prepared the first report on June 18, 1998. AR, Vol. 1, Tab 3 (first AFIP report).

The report is cursory and it is unclear upon which documentation in the "medical record" it bases its conclusions. It is also flawed in a number of respects. It states that Firefighter Bice suffered from "an acute myocardial infarction on October 21, 1996 which was complicated by respiratory failure and cardiogenic shock." The actual date of Firefighter Bice's heart attack was October 18, 1996. CSUF ¶¶ 3,4. We also note Dr. Lapa did not consider the death certificate because she was not provided with a copy of it. The certificate did not mention what role, if any, carbon monoxide poisoning might have played in Mrs. Bice's death.

In particular we are concerned with Dr. Lapa's answer to the central question: "Did smoke inhalation aggravate [Firefighter] Bice's heart condition?" AR, Vol. 1, Tab 3. Her answer is ambiguous, confusing and legally incorrect:

> We cannot determine what role smoke inhalation may or may not have had in aggravating her heart condition. She complained of 'getting too much smoke,' nausea and chest pain after fighting the fire for about 2½ hours, according to the Fire Chief of Etowah County Alabama Volunteer Fire Department. Individuals having a heart attack often experience chest pain, nausea, significant anxiety and often, a sense of impending doom. Being exposed to smoke under such conditions may have caused the perception that the smoke itself was the primary factor causing her symptoms. Smoke exposure (but not carbon monoxide intoxication) was probably an element in the stress and strain of fighting the fire, which probably initiated the heart attack. We do not consider this a traumatic injury according to your regulation [28 C.F.R. § 32.2].

Consider the sentences we quote in turn. The first seems to concede that smoke inhalation could medically have been a factor in aggravating Firefighter Bice's heart condition; it does concede that Dr. Lapa cannot measure this impact. The fifth sentence characterizes "smoke" as "an element in the stress and strain of fighting the fire." This is a factually inaccurate characterization. And, finally, Dr. Lapa states that "this" is not a traumatic injury, but it is unclear what the predicate is—"smoke" or "stress and strain," including (in her characterization) smoke. In either case, she made a legal conclusion—that smoke inhalation did not constitute a "traumatic injury" under the PSOBA.

While it is clear that stress and strain resulting in a heart attack would not qualify a claimant for PSOBA benefits, the same cannot be said of smoke inhalation. See 28 C.F.R. 32.2(g) (excluding stress and strain from the definition of traumatic injury); see also Smykowski v. United States, 227 Ct.Cl. 284, 647 F.2d 1103 (1981). Longstanding BJA rules include smoke, a "climatic condition," as a qualifying "traumatic injury." See 43 Fed.Reg. 41,302 (Sept. 15, 1978); see also AR, Vol. 1, Tab 37 (Second Final Decision). Dr. Lapa's position that smoke does not qualify as a traumatic injury is legally inaccurate. Finally, we are frankly perplexed as to the factual basis and ultimate meaning of Dr. Lapa's statement: "Smoke exposure (but not carbon monoxide intoxication) was probably an element in the stress and strain of fighting the fire, which probably initiated the heart attack."

To the question: "[w]hat physical effect did the injury have on the officer at the time of death," she responded, "not applicable." Notwithstanding Dr. Lapa's ambiguous statements, it is clear that she could not come to a conclusion as to whether smoke inhalation "may or may not" have played a role in Firefighter Bice's death. The Board, however, and the two subsequent AFIP reports interpreted this report as having come to a negative conclusion.

Based upon this report and other information contained in the record at that time, on July 27, 1998, the PSOB Program denied Mr. Bice's benefits claim. AR, Vol. 1, Tab 4. It concluded that Firefighter Bice did not suffer a traumatic injury in the line of duty, as defined by the regulations.

### The First Appeal—More Medical Opinion

On August 11, 1998, Mr. Bice appealed the determination. AR, Vol. 1, Tab 5. He provided additional submissions, including medical records and medical literature on carbon mo-

noxide poisoning tending to support his claim. AR, Vol. 1, Tabs 6–7, 9–11. A sworn affidavit from Dr. Carlton Duane Randleman, Jr. was provided. *Id.* at Tab 10. Dr. Randleman was the cardiovascular surgeon who performed heart surgery on Mrs. Bice on November 22, 1996. He is a board certified cardiovascular surgeon licensed to practice in the State of Alabama. In his affidavit he stated:

> Mrs. Bice's death certificate was completed by one of my associates. It contained the immediate cause of death which was heart failure and coronary arterial disease, but failed to list that the myocardial infarction was a consequence of a two hour exposure of physical activity of fighting a fire with *smoke and carbon monoxide inhalation. Since these factors contributed to her myocardial infarction, it is my opinion that these factors should have been added to the death certificate without the two hour exposure to fighting the fire, smoke, and carbon monoxide inhalation.(sic) She may have gone years without suffering a heart attack.*

(emphasis added; punctuation in original). Mr. Bice's attorney provided this affidavit in lieu of attempting to modify the death certificate.

Mr. Bice's appeal was assigned to Mr. Dave West, an Administrative Hearing Officer. AR, Vol. 1, Tab 8. Mr. West requested that AFIP prepare a second letter of review, ostensibly because they were not provided with additional materials during their first review, namely "the autopsy report or the death certificate of Ms. Bice." AR, Vol. 1, Tab 9. On January 25, 1999, AFIP prepared a second letter of review. AR, Vol. 1, Tab 12 (second AFIP report). The second AFIP review included a consideration of the first AFIP review, the medical records, and Dr. Randleman's affidavit. Dr. Jerry D. Spencer, Armed Forces Medical Examiner, wrote the report. He concluded that Mrs. Bice's "myocardial infarction on October 21, 1996, and her death on November 24, 1996 were caused by arteriosclerotic heart disease."

This second report clearly built upon a negative reading of the first AFIP report and accorded its apparent findings great weight. It also adopted the first report's dating error of October 21, 1996. Firefighter Bice actually suffered from her heart attack on October 18, 1996. CSUF ¶¶ 3,4. The second report was also cursory in nature and barely over one page long.

Dr. Spencer concluded that Mrs. Bice's heart attack in October and her subsequent death in November were caused by "long-standing arteriosclerotic heart disease." As to the effect firefighting had, Dr. Spencer admitted he was unsure of its role in causation: "[t]he physical activity from fighting a fire may have created additional demands on an already severely diseased heart." His analysis of Dr. Randleman's view is rather terse and unhelpful:

> Doctor Randleman states in his affidavit that Ms. Bice may have gone years without suffering a heart attack. She could also have died the day before fighting the fire from her heart disease, or at any other time from her heart disease alone.

Notably, the second report was silent on the critical question: "Did smoke inhalation aggravate [Firefighter] Bice's heart condition?" *See* AR, Vol. 1, Tab 3 (first AFIP report).

On March 11, 1999, Hearing Officer West issued his decision. He characterized the focal issue in the case as whether Firefighter Bice suffered a "traumatic injury," as defined in 28 C.F.R. § 32.2(f). Taking into consideration both AFIP reports, he concluded that:

> The facts are that Firefighter Bice engaged in firefighting with a very serious heart condition in which the stress and strain could have initiated the heart attack or aggravated her heart condition. Based on the evidence submitted Firefighter Bice did not suffer a traumatic injury as defined in Section 32.2(f).

Based upon this determination he denied Mr. Bice's claim. He did not address the role smoke may have played in her death.

*BJA Appeal: Still More Medical Opinion*

Mr. Bice appealed the Hearing Officer's denial to the Director of the BJA. AR, Vol. 1, Tab 14. Among other issues, Mr. Bice contested the finding that smoke inhalation did not constitute a "traumatic injury," pursuant

to the regulations. In his appeal, he made additional submissions, including a copy of the decision by the State Board of Adjustment of Alabama awarding him compensation due to his wife's death. AR, Vol. 1, Tab 15. This finding was not considered by the BJA in its determinations despite the assurance in a letter dated May 21, 1999, that all information submitted would be available to and considered by the Director. AR, Vol. 1, Tab 16 (The letter also mentions a memorandum from the Office of the General Counsel as now part of the Bice file and states that a copy is enclosed. The copy purportedly attached to the May 21, 1999, letter has not been provided to the Court.).

Mr. Bice provided the BJA with a copy of a publication entitled "Relative Contribution of Carbon Monoxide and Heart Diseases to the Death of Public Safety Officers," found at 43 Fed.Reg. 41,302 (Sept. 15, 1978). AR, Vol. 1, Tab 17. The publication discusses the findings of a meeting on the toxic effects of carbon monoxide. Mentioned previously, the meeting was held on April 21, 1978, and was attended by five leading medical experts and officials of the Law Enforcement Assistance Administration (LEAA), the predecessor to the BJA.

The meeting was an attempt to draft guidelines to aid in the determination of when the inhalation of carbon monoxide would be considered a "substantial factor" in a public safety officer's death. There was no question that carbon monoxide exposure could be a qualifying circumstance: "Inhalation of carbon monoxide is considered a traumatic injury." *Id.* at 41,303. Rather, the question was how much exposure was required. On the basis of the group's recommendations, the LEAA determined that it would find carbon monoxide inhalation a substantial factor in a public safety officer's death when the decedent had a carbon monoxide saturation level of 15 percent or greater at the time of the fatal event, in the case of a smoker; or 10 percent or greater, in the case of a nonsmoker. *Id.* at 41,304. The guidelines did not make the submission of blood gas test results a requirement of recovery. No guidelines were offered as to

determinations in the absence of test results, as in Firefighter Bice's case.

In addition to these materials and the affidavit by Dr. Randleman, Mr. Bice submitted an affidavit from Dr. Charles H. Colvin, III, Mrs. Bice's family doctor, who "examined her regularly." AR, Vol. 1, Tab 17. As we noted earlier, Dr. Colvin was one of the doctors who treated Firefighter Bice during her time at Baptist Medical Center in Birmingham, Alabama. AR, Vol. 1, Tab 6. He prepared the discharge summary for her discharge on November 4, 1996. Dr. Colvin's affidavit states, in relevant part:

> Based on the above and my own knowledge, education and experience, *it is my opinion to a reasonable degree of medical certainty that the effect of carbon monoxide was a most substantial factor in causing the death of Mrs. Bice.* I was her family doctor and examined her regularly. She never complained of chest pain suggestive of coronary disease.

AR, Vol. 1, Tab 17. In preparation for his expert opinion, Dr. Colvin reviewed information supplied by Mrs. Bice's co-workers and literature regarding the effects of carbon monoxide inhalation on coronary arteries.

Mr. Bice also submitted an affidavit from a third attending physician, Dr. William Stetler. AR, Vol. 1, Tab 17. Dr. Stetler is a board certified cardiologist who was one of Mrs. Bice's attending physicians during her October 1996 admission to Baptist Medical Center, Birmingham, Alabama. He is familiar with the effect of carbon monoxide on the heart and coronary arteries. He opined that:

> Carbon monoxide inhalation has been shown to impair exercise performance and aggravate symptoms in patients with coronary artery disease. It is known to produce vasoconstriction in coronary arteries.

> It is in my opinion that these factors along with the physical and emotional stress associated with fire fighting were substantial factors in the case of Mrs. Bice's myocardial infarction and in her subsequent death.

> *In my opinion the carbon monoxide and smoke inhalation were as substantial factors in the cause of Mrs. Bice's myocardial*

infarction as the underlying coronary disease.

(emphasis added).

Mr. Bice submitted a fourth medical affidavit, that of Dr. Alan Robert Dimick. AR, Vol. 1, Tab 17. Dr. Dimick is board certified in general surgery, licensed to practice in the State of Alabama, and familiar with the effects of carbon monoxide on the heart and its blood vessels. Dr. Dimick's resume is quite extensive and includes serving as the Director of the Burn Unit of the University of Alabama Hospital for 27 years and as an attending surgeon of that center for 29 years.

His resume also lists numerous professional memberships and accomplishments including 352 scientific presentations and 85 publications. Dr. Dimick currently serves as the Medical Advisor to the Birmingham Fire & Rescue Services Department and on the editorial board of the Journal of Burn Care & Rehabilitation. He is a past president of both the American Burn Association and of the North American Burn Society and served on the board of medical advisors to the International Association of Fire Fighters Burn Foundation.

He offered his expert opinion in Mrs. Bice's case:

> Based upon review of her medical records, my education and experience, it is my opinion, to a reasonable degree of medical certainty, that the smoke Mrs. Bice inhaled and the carbon monoxide that got into her blood stream caused additional damage to her coronary vessels and heart muscle such that she sustained her heart attack after the prolonged smoke and carbon monoxide inhalation. *The heart attack resulted in her death and the carbon monoxide was at least as substantial a factor in the cause of her heart attack as was the underlying undiagnosed coronary artery disease.*
>
> Since she was exposed to smoke and carbon monoxide inhalation for 2½ hours before any symptoms appeared, *it is highly probable that the carbon monoxide inhala-*

*tion was the most substantial factor at that time in causing her heart attack.*

(emphasis added).

### First Final Agency Decision

On July 23, 1999, the BJA Director issued the First Final Agency Decision of the Director, again denying Mr. Bice's claim for benefits. AR, Vol. 1, Tab 18. Ordinarily this decision would be the one that this Court would focus its review on. However, because a second final agency decision was issued, this is not the decision we review.

In a terse opinion, the Director, Nancy E. Gist, stated that Mr. Bice failed to provide sufficient evidence to demonstrate that Mrs. Bice's death "due to 'complications of atherosclerotic heart disease' suffered a traumatic injury as defined in [28 C.F.R. § 32.2(g)]." Moreover, she concluded that the reasonable doubt provision of 28 C.F.R. § 32.21(b) was not triggered because Mr. Bice carried the burden of showing a traumatic injury occurred. Director Gist found that Mr. Bice "failed to present any convincing medical evidence that the smoke and carbon monoxide inhalation was a substantial factor in Mrs. Bice's death." It is particularly noteworthy that Director Gist did not question that Firefighter Bice inhaled smoke and carbon monoxide.

Director Gist did not provide any analysis as to why she found the affidavits of the four doctors and the other medical literature cited by Mr. Bice so unpersuasive that taken as a whole they did not "present any convincing medical evidence." Director Gist did not refer to the Alabama award, much less assess its legal weight under the statute. And, finally, she misread the first AFIP report as having a negative opinion.

### Oral Hearing

On July 27, 1999, Mr. Bice requested an oral hearing under 28 C.F.R. § 32.24. AR, Vol. 1, Tab 19. He claimed that Hearing Officer West had stated that such a hearing would be allowed in the event of a final agency decision denying Mr. Bice's claim. Initially the BJA denied Mr. Bice's request for a hearing. AR, Vol. 1, Tab 20. Mr. Bice filed suit in this Court on October 1, 1999.

On November 15, 1999, Mr. Bice sent a letter to the Director of the BJA. AR, Vol. 1, Tab 23. He again requested an oral hearing. He also noted, yet again, that the State of Alabama had ruled that Mr. Bice was qualified for an award. He also stated that Mrs. Bice had been accepted to the National Fallen Firefighters' Memorial in Emmitsburg, Maryland. This is the first mention of the memorial designation in the record before us. But because the administrative record is incomplete in several requests, this information may have been provided to the Program at an earlier date. The BJA changed its position and complied with Mr. Bice's request for an oral hearing. Accordingly, the first lawsuit filed by the Plaintiff was voluntarily dismissed without prejudice by a Joint Stipulation of Dismissal filed on February 23, 2000. AR, Vol. 1, Tab 22, 24.

Mr. Paul Zolbe was assigned as the Hearing Officer in charge of the oral hearing. The hearing was held on January 12, 2001. AR, Vol. 1, Tab 28. Mr. Bice's attorney, Dr. Carl R. Robinson, represented him at the hearing. He acted both as an attorney and as a medical doctor, offering his medical opinion as to Mrs. Bice's case. Hearing Officer Zolbe requested that AFIP respond to a number of issues raised by Dr. Robinson. AR, Vol. 1, Tab 30.

On May 19, 2001, Dr. Steven C. Campman, Chief Deputy Medical Examiner, sent the BJA the third AFIP report in the Bice case. AR, Vol. 1, Tab 32 (third AFIP report). This third report was the first that did not dismiss Mr. Bice's claims in a cursory manner. Dr. Campman reviewed the earlier reports and adopted their findings. His report, however, manifests two glaring flaws. First, he contrasts the *objective* medicolegal opinion" offered by AFIP, based on "facts," with what in his mind was a failure of the claimant to offer any "objective proof" of carbon monoxide's presence or effects, due to a lack of empirical evidence. By "objective proof" and lack of "objective documentation" Dr. Campman can only be referring to the absence of test results for carbon monoxide presence in Firefighter Bice's blood or perhaps autopsy results.

Second, most of Dr. Campman's review addresses claims put forth by Mr. Bice's attorney, Dr. Robinson, who acted for the most part as a witness. As regards the affidavits of the three attending physicians, Drs. Colvin, Randleman, and Stetler, Dr. Campman dismisses them by attacking Dr. Robinson's characterizations and statements, rather than by addressing the firsthand views of those doctors. Dr. Campman fails to address Dr. Dimick's opinion at all.

Dr. Campman concludes that Mr. Bice's position rests on an assumed, but not documented, presence of carbon monoxide. In contrast, he characterizes the AFIP position as one resting upon documented heart disease: "Her [heart] disease was so severe that a quadruple coronary artery bypass was required." While he admits that Firefighter Bice's heart attack one month before she died was "likely precipitated by the effects of fighting a fire," he notes it could have also happened at another time. While he concedes that Firefighter Bice's symptoms could have resulted from carbon monoxide poisoning, he states that they are also symptomatic of myocardial infarction caused by atherosclerosis. Because he finds that the presence of carbon monoxide was "not documented," he adopts the later position.

*The Second Hearing Officer's Decision*

Hearing Officer Zolbe issued his decision upholding the denial of Mr. Bice's claim on June 21, 2001. AR, Vol. 1, Tab 34. In his determination, he characterizes the case as one of dueling medical viewpoints:

One positing the smoke inhalation by firefighter Bice acted as a chemical (traumatic injury) to perpetrate constriction of blood vessels sufficient to cause a cardiac episode resulting eventually in her death. The other position citing the health of Mrs. Bice, her medical history, and medical procedures to suggest that *smoke inhalation would not be sufficient in and of itself to cause death.*

(emphasis added). He concludes in favor of the latter position.

First, he adopts Dr. Campman's reliance on the absence of empirical data as a fatal weakness in the Plaintiff's case. Second, in rejecting smoke as a "traumatic injury,"

Hearing Officer Zolbe posited several new medical theories which we could not find support for either in the AFIP reports or other evidence. For example, he stated that "pulmonary complications cleared up suggesting that the effect of the chemical aspect of the smoke on the pulmonary system did not contribute to her later death." He characterizes Firefighter Bice's quadruple bypass as:

> prima facie evidence of a serious heart problem. Obviously not a problem whose genesis would be found in an event one month previous. It might appear to a lay observer that the inhalation of carbon monoxide, to the extent *suggested by the testimony but unsubstantiated by empirical data*, would have caused Mrs. Bice's death at the fire scene considering the extent of her heart disease. (emphasis added).

To the extent that he suggests Firefighter Bice's smoke inhalation "obviously" had nothing to do with her later death, his lay opinion contradicts that of several experts. In this respect, we recall the first AFIP report. Dr. Lapa stated that she could not determine what role smoke inhalation may have had in aggravating Mrs. Bice's heart condition. Hearing Officer Zolbe speculates that "[f]rom a trauma standpoint Mrs. Bice may have died because of failed surgery but that is not determinable." He offers other vague conjecture as to the cause of Mrs. Bice's death but is unable to cite to either expert opinion or the record in support of his theorizing.

To summarize Hearing Officer Zolbe's decision, he accepted as a fact that Firefighter Bice inhaled smoke and carbon monoxide. However, in the absence of empirical evidence, he accepted the AFIP view that the smoke inhalation did not constitute a traumatic injury in light of the underlying heart disease.

### Second Final Decision

Mr. Bice appealed Hearing Officer Zolbe's denial to the BJA Director. AR, Vol. 1, Tab 35. In making a second final determination, the BJA Director reviewed all of the case records, including Mr. Zolbe's decision. AR, Vol. 1, Tab 36. On May 28, 2002, the BJA issued its Second Final Agency Decision of the Director, upholding Hearing Officer Zol-

be's denial of Mr. Bice's claim. AR, Vol. 1, Tab 37.

This time Director Richard Nedelkoff issued the decision. AR, Vol. 1, Tab 37. To the extent that Hearing Officer Zolbe presented the Bice case as posing two competing theories of death, the Director adopted this description. He noted that the "three" medical experts who provided affidavits, Drs. Chandler, Stetler and Dimick, are board certified, and that the AFIP physicians who reviewed the file are board certified forensic pathologists. However, he failed to mention Dr. Colvin, or his affidavit.

Director Nedelkoff rejected all of the expert opinions offered by Mr. Bice on the grounds that the opinions were premised upon the "assumption" of carbon monoxide inhalation by Mrs. Bice. He stated that "[i]t is undisputed, however, that the test for carbon monoxide was never performed on Mrs. Bice and, therefore, these medical experts have no way of knowing how much or even whether Mrs. Bice inhaled carbon monoxide." As did Dr. Campman and Hearing Officer Zolbe, Director Nedelkoff once again cites the absence of carbon monoxide test results as the grounds for rejecting medical opinion favorable to Firefighter Bice.

He also rejected Mr. Bice's contention that the reasonable doubt rule applies. Found at 28 C.F.R. § 32.4, it requires the Bureau to resolve "any reasonable doubt arising from the circumstances of the public safety officer's death" in favor of the claimant for benefits. Director Nedelkoff rejected applying the "reasonable doubt provision" based upon his contention that Mr. Bice failed "to present sufficient evidence on which a reasonable doubt can be based." He dismissed the evidence of smoke and carbon monoxide inhalation as "circumstantial," and stressed the absence of "objective evidence." He thus characterized Mr. Bice's claim as "speculative," citing the *Tafoya* case. *Tafoya v. United States*, 8 Cl.Ct. 256 (1985). He concluded by quoting Hearing Officer Zolbe:

> ...the fact remains that Mrs. Bice had an advanced heart problem thereby placing her case among those excluded from consideration for benefits under the guidelines

of the Public Safety Officers' Benefits Program.

He did not refer to the Alabama State award or the National Fallen Firefighters' Memorial recognition.

## DISCUSSION

### The PSOBA

As a remedial statute, the PSOBA "should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes." *Demutis v. United States*, 48 Fed.Cl. 81, 86 (2000). "A liberal construction is ·ordinarily one which makes the statutory rule or principle apply to more things or in more situations than would be the case under a strict construction." 3 N. Singer, Sutherland Statutory Construction § 60.1 (6th ed.2001). At the time Mr. Bice applied for benefits, the PSOBA provided for a payment of a $100,000 death benefit to the surviving spouse and children of a public safety officer who had "died as a direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a) (1996). Pursuant to its statutory authority the LEAA, and later the BJA, promulgated implementing regulations. *See* 28 C.F.R. §§ 32.1–32.40.

### Standard of Review:

Motions for judgment upon the administrative record are reviewed under the same standard as motions for summary judgment. *See* Rule 56.1(a) of the Rules of the United States Court of Federal Claims (RCFC). The standard for summary judgment is well known: summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). When a Court is presented with cross-motions for summary judgment, as in this case, we hold each party to that standard. *See Cubic Defense Sys. v. United States*, 45 Fed. Cl. 450, 457 (1999).

Generally, our review of administrative decisions is limited to determining:

(1) whether there has been substantial compliance with statutory and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was substantial evidence supporting the decision. *Morrow v. United States*, 227 Ct.Cl. 290, 647 F.2d 1099, 1103 (1981). The Director's Second Final Decision is the BJA's final decision and as such is judicially reviewable by suit in this Court. 28 C.F.R. § 32.24(h)(2).

There were two rounds of briefing in this matter. In the second round of briefing the parties addressed the following issues: whether the BJA read a requirement of "objective" evidence into the PSOBA; whether the BJA properly afforded the findings of fact presented by the State of Alabama the weight they were due under 28 C.F.R. § 32.5; the proper definition of "substantial factor," as employed by 28 C.F.R. § 32.2(d); and whether the BJA properly applied the rule that "reasonable doubt" must be resolved in favor of payment under 28 C.F.R. § 32.4. We address these issues in turn. But first we clarify an apparent confusion as to whether smoke inhalation meets the statutory requirement of a "traumatic injury," under the statute. *See* 42 U.S.C. § 3796 (1996); 28 C.F.R. § 32.2(g).

### Smoke inhalation constitutes a "traumatic injury":

█ The PSOBA provides for death benefits in cases where the BJA determines that a public safety officer has "died as a direct and proximate result of a personal injury sustained in the line of duty." · 42 U.S.C. § 3796 (1996). The regulations define the term "personal injury" to include traumatic injuries. 28 C.F.R. § 32.2(e)-(g). Traumatic injury "means a wound or condition. of the body caused by external force, including... chemicals, electricity, *climate conditions*...but excluding stress and strain." *Id.* at § 32.2(g) (emphasis added).

The Plaintiff does not dispute that a death resulting from a heart disorder would not be covered by the PSOBA unless a "traumatic injury" was a substantial factor in causing that death. *See, e.g., Smykowski*, 647 F.2d 1103. In *Morrow*, Fireman Morrow was afflicted by smoke inhalation while fighting a fire. 647 F.2d 1099. The U.S. Court of Claims found that smoke constituted "climate

conditions" and therefore met the test of injury under the PSOBA. *Id.* at FN1. It based its finding on a "Commentary" which appears directly following the regulations in the Federal Register and states that "[c]limate conditions include atmospheric conditions, *such as dense smoke.*" *Id.*, citing 42 Fed.Reg. 23,260 (May 6, 1977) (emphasis added). Under *Morrow,* a finding that Firefighter Bice inhaled smoke for 2½ hours would meet the requirement of a traumatic injury under the PSOBA.

The Second Final Agency Decision states that "[t]he PSOB Office has always recognized that smoke alone can be a traumatic injury." AR, Vol. 1, Tab 37. Despite this legal definition, the Administrative Record is replete with the expression of views to the contrary. For example, Dr. Lapa concluded in the first AFIP report that smoke inhalation was not a "traumatic injury." AR, Vol. 1, Tab 3. Even so, she was unable to offer a conclusion as to whether smoke inhalation was a factor in Firefighter Bice's death. The first Hearing Officer, Mr. West, concluded that Firefighter Bice did not suffer from a traumatic injury as defined by the regulations. AR, Vol. 1, Tab 13. There was no correction of this erroneous view until the Second Final Agency Decision.

*The BJA's "objective" evidence requirement:*

■ The PSOBA regulations define "evidence," in the context of a hearing, as follows:

> In conducting the hearing, the hearing officer shall not be bound by common law or statutory rules of evidence, by technical or formal rules or procedures, or by Chapter 5 of the Administrative Procedure Act, but must conduct the hearing in such a manner as best to ascertain the rights of the claimant.

28 C.F.R. § 32 (Appendix). By this we understand that the strict rules of evidence do not apply, and that the program will be liberal in its acceptance of a claimant's proffers of support. Most assuredly, the regulations do not specify that certain kinds of evidence are necessary to prove a claim; and certainly do not require objective or "empirical" evidence in order to prove exposure to smoke and carbon monoxide. *See* 28 C.F.R.

§ 32.21 (discussing claimant's burden of production); *see also* 28 C.F.R. § 32.2 (definitional section, no definition of evidence provided). Despite this, the lack of "objective" evidence was repeatedly cited in the record. Dr. Campman, Hearing Officer Zolbe, and Director Nedelkoff referred to the absence of "empirical" or "objective" evidence, test results, and an autopsy fully sixteen times, all told, in terms which clearly show that this was found to be a critical omission in the Plaintiff's case. AR, Vol. 1, Tabs 32, 34, 37. As such, the BJA imposed an unauthorized evidentiary requirement on the claimant.

The Defendant argues "[t]he only differentiation between 'objective' and other evidence in the record is in the evaluation of the medical evidence which...AFIP provided to the hearing officer." Def.'s Br. filed Jan. 23, 2004, at 2. This is simply untrue. And we note, while attempting to reject the notion that the BJA wrongfully required "objective evidence," the Government undermines its own argument. It states "[h]ad Mr. Bice presented evidence in support of his claim other than unfounded supposition, the final agency decision might have been different." Def.'s Br. filed Jan. 23, 2004, at 5. Clearly, this views the evidence proffered by Mr. Bice as something less than proper evidence, as "unfounded supposition."

Although by no means the only occasion where Director Nedelkoff imposes this special evidentiary requirement, we are particularly struck by his summary of the Plaintiff's evidentiary case:

> The claimant concedes that any carbon monoxide inhalation by Mrs. Bice was not documented (due to equipment failure at the hospital). He attempts to rely instead on circumstantial evidence, including Mrs. Bice's medical history, to support his theory that Mrs. Bice's death resulted substantially from carbon monoxide inhalation.

AR, Vol. 1, Tab 37. Director Nedelkoff characterizes the evidence proffered by Mr. Bice as "circumstantial" because carbon monoxide inhalation was not documented due to hospital equipment failure. Moreover, he states:

> Claimant's medical experts base their opinions on the *assumption of carbon monox-*

*ide inhalation* by Mrs. Bice. It is undisputed, however, that the test for carbon monoxide was never performed on Mrs. Bice and, therefore, these medical experts have no way of knowing how much *or even whether* Mrs. Bice actually inhaled carbon monoxide. Both claimant and his various experts testify as to the fact that carbon monoxide can restrict the arteries which under certain circumstances may produce a heart attack. Yet, *no evidence, is offered by the claimant to show that Mrs. Bice actually inhaled a quantity of carbon monoxide sufficient to cause a heart attack.* Furthermore, claimant repeatedly argues that smoke alone by itself can be a traumatic injury. . . . The PSOB Office has always recognized that smoke alone can be a traumatic injury under the PSOB Regulations. The issue in this case is not whether smoke is a traumatic injury, but whether the claimant has demonstrated through evidence that carbon monoxide inhalation was a substantial factor in Mrs. Bice's death.

(emphasis added, internal citations and footnotes omitted). This reads in a requirement of "objective" evidence. Direct evidence in the form of uncontested statements by Firefighter Bice that she inhaled smoke and affidavits in her support by two other firefighters are ignored completely, while the medical opinions of four experts are characterized as merely "circumstantial."

Director Nedelkoff quotes from sections of the third AFIP report, by Dr. Campman, that characterize the presence of carbon monoxide as "assumed" and "never documented." The Director's reliance on the third AFIP report's presumption of a need for "objective" evidence is underlined by his statement that "the test for carbon monoxide was never performed on Mrs. Bice and, therefore, these medical experts [who support the claimant] have no way of knowing how much or even whether Mrs. Bice actually inhaled carbon monoxide." Not only does the BJA decision require "objective" evidence in order to make its determinations, apparently it requires the same of medical experts who provide it with their opinions. Nothing in the record suggests that the four doctors who provided supporting affidavits were not qualified; each based his opinion on the medical record, and in some instances on direct observation of the patient.

Hearing Officer Zolbe also based his conclusions upon a lack of what he called "objective" evidence. AR, Vol. 1, Tab 34. The lack of empirical evidence in the form of early data on blood gases and the lack of an autopsy troubled Mr. Zolbe. He characterizes those items as among the difficulties facing his determination of the case, a characterization adopted by Director Nedelkoff.

Ultimately, the BJA characterizes the Bice claim of smoke and carbon monoxide inhalation as "based on speculation and conjecture" and compares it with the claim in *Tafoya,* 8 Cl.Ct. 256. This comparison cannot withstand analysis. In *Tafoya,* the issue was whether or not the deceased police officer, the plaintiff's son, was killed while acting in the line of duty. Officer Tafoya was found dead the morning after he spent the night working his off-duty job as a security person at a local bar. Despite being off duty, he had worn his police officer uniform and carried a loaded police handgun. He had been drinking through the night and there were no witnesses to his shooting. After he passed out at the bar, the bar owner and his son moved him to his van. His body was found outside of his van, 1½ blocks away. He had been killed by a shot from his own revolver.

In order to support her claim that Officer Tafoya died in the line of duty, the plaintiff in that case relied primarily on the testimony of a homicide investigator. The investigator offered his scenario on what he felt occurred. He speculated that unidentified individuals attempted to break into Officer Tafoya's van, while he slept, that he awoke and chased them—thus acting in the line of duty—before they overpowered him and shot him. In order to reach a determination that Officer Tafoya was acting in the line of duty, the nature of his actions when he was shot had to be of the type "normally associated" with the responsibilities of a police officer. The offered scenario was based entirely upon conjecture. There was absolutely no evidence to explain the circumstances of Officer Tafoya's death.

The totally speculative scenario presented in *Tafoya* cannot be equated to the evidence that supports Mr. Bice's benefits claim. First and most important, we have direct evidence in the statements by Firefighter Bice that she inhaled too much smoke. The recitations of facts throughout this case repeatedly state *"she complained of too much smoke."* While the BJA required objective evidence of carbon monoxide inhalation, the third AFIP report conceded "yes, we all recognize that carbon monoxide is virtually always a component of smoke." AR, Vol. 1, Tab 32. Despite this recognition, the BJA failed to consider evidence of smoke inhalation as evidence in the Plaintiff's favor.

The CSUF states Firefighter Bice *"fought a fire in heavy smoke for approximately 2–1/2 hours,* in the line of duty, before *complaining of smoke inhalation,* nausea, and chest pains."* CSUF ¶ 3 (emphasis added). Nowhere in the Administrative Record is this statement challenged, nor is there independent contrary evidence, for example, that she was wearing a mask. *See, e.g., Greeley v. United States,* 50 F.3d 1009 (Fed.Cir.1995) (Upholding a BJA factual finding that Firefighter Greeley wore a breathing apparatus as supported by substantial evidence.). (The fact that no other member of her team succumbed to the smoke inhalation is, of course, irrelevant.) *See* AR, Vol. 1, Tab 37 (Second Final Decision).

The BJA also ignored evidence in the form of Firefighter Bice's medical records and statements made by two of the firefighters who fought alongside her. The West Etowah Volunteer Fire Department Emergency Medical Report listed Firefighter Bice's chief complaints as chest pain, nausea, shortness of breath, *and smoke inhalation.* AR, Vol. 1, Tab 17 (emphasis added). The only mention of the significance of the diagnosis that Firefighter Bice suffered from pulmonary edema and hemoptysis was by Hearing Officer Zolbe who postulated her "pulmonary complications cleared up suggesting that the effect of the chemical aspect of the smoke on the pulmonary system did not contribute to her later death." AR, Vol. 1, Tab 34. The Second Final Decision failed to consider this medical diagnosis at all. *Compare with*

*Morrow,* 647 F.2d at 1102 (hearing officer's analysis emphasizing "no edema was reported...it can be assumed further that the effects of the carbon monoxide on his body were not sufficient to cause real respiratory problems").

The BJA also failed to consider as evidence two affidavits provided by members of the West Etowah County Volunteer Fire Department, both firefighters who fought alongside Firefighter Bice during the brush fire. AR, Vol. 1, Tab 17. Firefighter Terry Blakely, the Fire Chief of the Department, related that the group fought in "heavy smoke" for two and a half hours before Firefighter Bice *"complained of getting too much smoke,* nausea and chest pain." AR, Vol. 1, Tab 6 (emphasis added). Firefighter John D. Smith, the Assistant Fire Chief of the Department, concurred with Chief Blakely. After her blood pressure was checked, he related that Firefighter Bice continued to complain of nausea, *smoke inhalation* and chest pain. Subsequently, he escorted her to Altoona, Alabama to the Department of Public Safety where he left her with paramedics.

In addition to this direct evidence of smoke inhalation, we have the expert opinion offered by four physicians, three of whom have the benefit of first-hand observation. Director Nedelkoff discounts these expert opinions as not being "evidence." This is, of course, not true. As a general proposition, expert evidence qualifies as evidence. *See, e.g.,* Fed. Rules Evid. R 702 (experts may offer opinion evidence). Moreover, a "Commentary" which appears directly following the PSOBA regulations in the Federal Register (but not in the Code of Federal Regulations) states that "[i]f appropriate, the opinions of other pathologists or cardiologists will be solicited." 42 Fed.Reg. 23,260 (May 6, 1977).

As to Director Nedelkoff's dismissal of the claimant's "circumstantial" evidence, we note that in the most strict venue as regards admissible evidence, a criminal trial, jurors are admonished that "circumstantial" evidence is just as valid as direct evidence:

Evidence may be direct or circumstantial. Direct evidence is testimony by a witness

about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact. You are to consider both direct and circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

1 Devitt, Blackmar & Wolff Federal Jury Practice and Instructions § 10.01 (4th ed.1992), quoting Manual of Model Criminal Jury Instructions for the Ninth Circuit, Instruction No. 1.05 (1992). The BJA committed legal error in requiring "objective" evidence. We remand to allow it an opportunity to address the proper weight to be afforded the evidence it previously improperly ignored.

*The State of Alabama Award and Firefighter Bice's inclusion in the National Fallen Firefighters' Memorial:*

■ There is a third category of evidence tending to prove Firefighter Bice inhaled smoke and carbon monoxide. The State of Alabama awarded compensation in the amount of $50,000 to Mr. Bice on May 19, 1998, under a statute similar in purpose to the PSOBA. AR, Vol. 1, Tab 15; *see generally* Code of Ala. § 36–30–1, *et seq.* The State of Alabama found that Firefighter Bice died of an injury sustained in the line of duty. The award requires that the injury or death "occurred during the course of employment or activity as a . . fireman." Code of Ala. § 36–30–1. In making the award, the State Board of Adjustment made the following finding of fact, that Firefighter Bice "died of heart failure following smoke inhalation at the scene of a fire." The BJA failed to consider the state award, making no mention of it in any of its decisions. In doing so, it failed to comply with 28 C.F.R. § 32.5, which requires it to:

> . . .*give substantial weight to the evidence and findings of fact presented by State, local, and Federal administrative and investigative agencies.* The Bureau will request additional assistance or conduct its own investigation when it believes that the existing evidence does not provide the Bu-

reau with a rational basis for a decision on a material element of eligibility.

(emphasis added). The Board's failure to give the required weight to this award, or even weight to refer to it, is independent reversible error.

The Defendant argues that the BJA should be excused from its failure to consider the state findings because "Mr. Bice did not present it to the hearing officer." Def.'s Br. filed Jan. 23, 2004, at 6. Counsel's representation is inaccurate, no doubt the result of carelessness in reviewing the record. The Administrative Record demonstrates that Mr. Bice submitted the Alabama decision at least twice in April of 1999. *See* AR, Vol. 1, Tab 14–15. (We note that the Administrative Record appears to be missing some of the correspondence between the parties and therefore it is possible the award was submitted additional times.) The submissions were part of Mr. Bice's request for reconsideration of the first Hearing Officer's denial of his application for PSOBA benefits. As part of these submissions, Mr. Bice cited 28 C.F.R. § 32.5, explicitly providing the BJA with the proper standard of review. During his second round of final BJA appeals, Mr. Bice mentioned the award a third time, in a letter dated November 15, 1999. AR, Vol. 1, Tab 23.

That letter also noted that Mrs. Bice was accepted to the National Fallen Firefighters' Memorial in Emmitsburg, Maryland. AR, Vol. 1, Tab 23. Neither the Second Final Decision nor any earlier review even mentions this award, despite the regulatory requirement that "substantial weight" be afforded its evidence and findings of fact.

*Substantial factor*

The next issue we face is whether Firefighter Bice's injury, if caused by smoke inhalation, was a "direct and proximate" or "substantial" factor in her death. The regulations state that "direct and proximate" means "that the antecedent event is a substantial factor in the result." 28 C.F.R. § 32.2(d). As predecessor to the BJA, LEAA's General Counsel issued a legal opinion as to the meaning of "substantial factor" on September 12, 1977. The opinion states, in relevant part:

Generally, you should consider a traumatic injury a 'substantial factor' in an officer's death when...(2) the injury contributes to the officer's death to as great a degree as any other contributing factor, such as preexisting chronic, congenital, or progressive disease.

*quoted in Morrow,* 647 F.2d at 1100–01. The court in *Morrow* went on to state that "[w]e make no holding as to the propriety of the LEAA General Counsel's particular construction of the term 'substantial factor'—which strikes us as somewhat cramped." We share that view.

The Government argues that this definition should be afforded *Chevron* deference. Def.'s Br. filed Jan. 23, 2004, at 11–12, citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* an agency's interpretation of a statutory provision is accorded deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). But, "[i]nterpretations such as those in opinion letters...do not warrant *Chevron-* style deference." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Opinion letters are entitled to respect but only to the extent that they have the power to persuade. *Id.; see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). We reject the Government's contention that this LEAA opinion must be given *Chevron* deference.

The question of the proper legal definition of "substantial factor" is therefore one which this Court may review *de novo.* However, we do not need to reach the issue of the proper legal definition of substantial factor at this juncture of the case. Rather, we agree with Director Nedelkoff's approach—the determination in this case turns on the proper application of the "reasonable doubt" provision of the BJA.

*Reasonable doubt*

In accordance with its role as a remedial statute, the PSOBA regulations provide that "the Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death...in favor of payment of the death or disability benefit." 28 C.F.R. § 32.4. Moreover: "[i]n those cases where LEAA cannot reasonably determine which factor—the heart condition or the personal injury—was the substantial causal contribution to death, it [shall apply 28 C.F.R. 32.4]." 42 Fed.Reg. 23,254 (May 6, 1977) (Supplementary Information).

In civil adjudication, courts generally impose a burden of persuasion of "preponderance of the evidence," understood as simply more likely than not. In special circumstances, a higher burden of "clear and convincing evidence" may be required to prevail. Rarely, if ever, do we find a burden "beyond a reasonable doubt" or, conversely, a "reasonable doubt":

The standard of proof utilized in an adjudication reflects a very fundamental assessment of the comparative social costs, or 'disutility,' of erroneous factual determinations. Justice Harlan's well known 'social disutility' analysis recognizes (1) the factfinder can rarely, if ever, acquire unassailably accurate knowledge of what happened—a belief of what probably happened is general the best that can be achieved, and (2) the factfinder, even after the most diligent of efforts, will sometimes reach the wrong factual conclusions.

*Price v. Symsek,* 988 F.2d 1187, 1192–93 (Fed.Cir.1993) (internal citations omitted). The Supreme Court has repeatedly utilized this "social disutility" analysis in determining the appropriate burden of proof. *Id.* at 1193; *see also Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). We recognize that courts should hesitate before determining that the "beyond a reasonable doubt" burden of proof applies in a noncriminal context. *Id.* at 428, 99 S.Ct. 1804. In this matter, however, it is not we who make that determination. Here, the agency has itself adopted the most lenient standard of all, reasonable doubt, for the claimant's burden of persuasion.

The program does not explain the reason for adopting this standard, but the choice is certainly not accidental. It seems only appropriate that a program designed to offer benefits to law enforcement personnel should adopt as the standard to win those benefits the same lenient burden of persuasion criminal defendants must show to win acquittal. Since the application of this standard was an element in Director Nedelkoff's Second Final Decision, and will be on remand, it is appropriate to offer some guidelines.

First, we note that the Veterans Act regulations use the same term, "reasonable doubt," in applying the statutory "benefit of the doubt" provision. See 38 U.S.C. § 5107; 38 C.F.R. § 3.102 (implementing regulations). Both the statute and the regulations go on to explain that what is meant is a near equipoise of evidence for and against the proposition in question, requiring "an approximate balance of positive and negative evidence" regarding a material issue before reasonable doubt will be applied. 38 U.S.C. § 5107; see also Ortiz v. Principi, 274 F.3d 1361 (Fed.Cir.2001).

We have no such special statutory or regulatory definition or qualification for the meaning of "reasonable doubt." We therefore look for an understanding of this term where it is commonly used, the criminal law. The explanation found in jury instructions is as follows:

> A 'reasonable doubt' is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

1 Devitt, Blackmar & Wolff Federal Jury Practice and Instructions § 10.01 (4th ed.1992), quoting Pattern Jury Instructions of the District Judges Association of the Eleventh Circuit, Criminal Cases, Trial Instruction No. 1.2 (1985). "A fanciful doubt is not a reasonable doubt." Victor v. Nebraska, 511 U.S. 1, 17, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Consistent with criminal law,

something more than a possibility is required.

Finally, we recognize that despite the guidance we obtain from the criminal law, this is still a civil proceeding. Hence it is not the Government's burden to disprove the Plaintiff's case beyond a reasonable doubt. The Plaintiff still has the burdens of going forward and of persuasion. It is thus incumbent upon the Plaintiff to present an affirmative case for relief, a prima facie case, with sufficient evidence to raise a reasonable doubt. See 28 C.F.R. § 32.21(b) ("claimant's failure to submit evidence on a material issue or fact as requested by the Bureau shall be a basis for determining that the claimant fails to satisfy the conditions required to award a benefit or fee or any part thereof"). "The mere possibility of traumatic injury is not enough to give rise to a claim under the PSOBA." Greeley, 50 F.3d at 1011.

In addition to Tafoya, there are a number of cases which have considered the reasonable doubt standard. These range from Morrow, 647 F.2d 1099, which found the evidence insufficient to raise a reasonable doubt, to Davis v. United States, 50 Fed.Cl. 192 (2001) (Davis II), in which the court found the evidence amounted to a reasonable doubt as a matter of law.

The court in Morrow stated that there was no "reasonable doubt" as to whether or not smoke inhalation might have been a substantial factor in Firefighter Morrow's death. Rather "the obvious and overwhelming cause of death was heart disease—pre-existing, prolonged, and degenerative." Morrow, 647 F.2d at 1103. The court found that the resulting record of lay and scientific evidence supported the agency's position that smoke inhalation did not contribute as a "substantial factor" in the fireman's death. This was an analysis that required the weighing of evidence.

The evidence included an autopsy, which was not performed in Mrs. Bice's case. Also Morrow did not suffer from edema, unlike Firefighter Bice, from this the hearing officer "assumed further that the effects of the carbon monoxide on his body were not sufficient to cause real respiratory problems." Id. at 1102. We note that at no point did

AFIP address Firefighter Bice's edema or her other respiratory complications. Firefighter Morrow previously suffered from a heart attack, unlike Firefighter Bice who had no previous medical history of heart problems. While the AFIP position in Morrow supported the determination that smoke inhalation was not a substantial factor in his death, no competing expert opinions were offered by the claimant.

Similarly, in *Greeley*, 50 F.3d 1009, the court held that the plaintiff failed to make a prima facie showing of a traumatic injury. The Federal Circuit found the plaintiff presented "no evidence that any of these injuries occurred," and thus reversed the lower court's application of the reasonable doubt provision. *Id.* at 1011. The lower court had implied that Chief Greeley did not wear a breathing apparatus. *Greeley v. United States*, 30 Fed.Cl. 721 (1994). This was in direct conflict with the factual finding of the BJA that he had worn such an apparatus, a finding supported by substantial evidence. Moreover, the plaintiff's experts in *Greeley* disagreed that heart disease was the cause of death, yet merely offered "speculation," without support to the contrary. The Federal Circuit found that the "mere possibility of traumatic injury" was insufficient to give rise to a claim. In direct contrast, it is uncontested that Firefighter Bice complained of smoke inhalation. As we discussed in our section on evidence, Mr. Bice presented evidence, as opposed to speculation, of her traumatic injury.

The reasonable doubt rule applies to all questions of fact. *See Davis II*, 50 Fed.Cl. at 210, citing *Demutiis*, 48 Fed.Cl. at 88–90. "The only question of fact to which the reasonable doubt rule would not apply is one where there is insufficient evidence for the finder of fact to formulate a reasonable doubt." *Davis II*, 50 Fed.Cl. at 210. Therefore, in its determination upon remand the BJA must apply the reasonable doubt provision to all questions of fact for which prima facie evidence in favor of the Plaintiff exists.

## CONCLUSION

We thus conclude that the Second Final Agency Decision contained two fatal flaws: it imposed unauthorized qualifications on the nature of the evidence as to whether Firefighter Bice inhaled smoke and carbon monoxide; and it did not give substantial weight to the factual findings of the pertinent State and Federal agencies. **We thus remand to the BJA for a correction of these errors and a decision consist with this ruling.** *See* 28 U.S.C. § 1491(a)(2) (discussing this Court's remand authority).

**Upon remand, the BJA shall redetermine the Plaintiff's eligibility for compensation under the PSOBA and its implementing regulations in a manner consistent with this Opinion. The redetermination shall fully explain its factual and legal bases and shall be filed with this Court no later than December 20, 2004. The Defendant shall file a status report indicating the progress of the remand on October 20, 2004.**

## POSTSCRIPT

For decades, the PSOB Program has wrestled with the problem of resolving claims when heart disease and heart attacks are implicated. Our case and some of our case references illustrate this problem all too well. This problem may finally be solved, at least for the future. Congress has now spoken directly to the matter of public safety officers who die of heart attacks sustained in the line of duty. On December 15, 2003, Congress amended the PSOBA through the Hometown Heroes Survivors Benefits Act of 2003, P.L. 108–182, § 2, 117 Stat. 2649. The PSOBA now provides that:

> if a public safety officer dies as the direct and proximate result of a heart attack or stroke, that officer shall be presumed to have died as the direct and proximate result of a personal injury sustained in the line of duty, if...that officer, while on duty...engaged in...fire suppression.

42 U.S.C. § 3796(k) (2004). Under the amendment, it appears that there would be no question that the circumstances of Mrs. Bice's death would entitle Mr. Bice to benefits. However, the amendment is effective only for deaths occurring after its enactment, and this claim cannot benefit from the new

view. The BJA must therefore wrestle with the problem at least one last time.

Senator Leahy, one of the amendment's sponsors, stated its purpose was to fix the "loophole" in the PSOB Program which disallowed benefits in the case of a heart attack or stroke, drawing a distinction between traumatic and occupational injuries. *See* 108 Cong. Rec. S2855 (daily ed. Feb. 26, 2003). He stated his belief that such distinctions were not part of Congress' intent when the legislation implementing the PSOB Program was established, during his first term in the Senate.

He noted that heart attack and cardiac related deaths accounted for almost half of all firefighter fatalities, between 45 and 50 deaths, and an average of 13 police officer deaths each year, but that the families of the officers were rarely eligible for benefits: "Clearly, we should be treating surviving family members of officers who die in the line of duty with more decency and respect. . . .The families of these brave public servants deserve to participate in the PSOB Program if their loved ones die of a heart attack while selflessly protecting us from harm."

**IT IS SO ORDERED.**