**Charles BICE, Executor of the Estate of Martha Bice, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 02–784C.**

United States Court of Federal Claims.

Sept. 6, 2006.

---

Professor Michael McGonnigal, Columbus Community Legal Services, Catholic University of America, Washington, D.C., Counsel of Record for Plaintiff. With him on the briefs were Kelly M. Loud and Kelly Allison Belli, Law Student Interns. Peggie N. McWhorter and Jonathan Coy, Law Student Interns, argued.

J. Reid Prouty, Commercial Litigation Branch, Department of Justice, Washington, D.C., Counsel of Record for the Defendant. With him on the briefs were David M. Cohen, Director, Franklin E. White, Jr., Assistant Director, and Peter D. Keisler, Assistant Attorney General.

Linda Fallowfield, Bureau of Justice Assistance, Department of Justice, Washington, D.C., Of Counsel for Defendant.

Stephanie Wilson, law clerk.

## OPINION

BASKIR, Judge.

Plaintiff, Charles Bice, widower and executor of the estate of Firefighter Martha Bice, filed his Complaint on July 12, 2002, appealing the May 28, 2002, Final Agency Decision of the Director (hereinafter, "Second Final Decision") of the Bureau of Justice Assistance ("BJA") denying him survivor's benefits pursuant to the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. § 3796, *et seq.* (1996).

The PSOBA provides benefits to survivors of public safety officers who are killed "as a direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a) (1996). In a July 29, 2004 Opinion, we found that the BJA improperly disregarded evidence favorable to the Plaintiff in violation of the applicable statute and regulations, and imposed evidentiary limitations unauthorized by regulation or statute. We reversed the BJA's determination and remanded the matter to the BJA to redetermine Plaintiff's eligibility for compensation in light of our ruling. *Bice v. United States,* 61 Fed.Cl. 420, 437 (2004).

On December 20, 2004, the BJA issued its Response to Re-determination Remand of the United States Court of Federal Claims (hereinafter, "BJA Response"), again denying Plaintiff survivor benefits under the PSOBA. On January 28, 2005, Plaintiff filed a Request for Enforcement of Judge Baskir's Order. This case is now before the Court on Plaintiff's Motion for Judgment on the Administrative Record.

We find that the BJA committed prejudicial error by failing to follow our instructions on remand. We also find that the BJA acted in an arbitrary and capricious manner by failing to comply with the PSOBA and its implementing regulations, and by continuing to impose impermissible evidentiary burdens on Plaintiff and Plaintiff's medical experts. **Consequently, we reverse the BJA's redetermination on remand.**

Furthermore, we find that Plaintiff did establish a *prima facie* case and is entitled to PSOBA survivor benefits under the reasonable doubt standard. **We therefore GRANT** Plaintiff's Motion for Judgment on the Administrative Record and award Plaintiff benefits in accordance with the PSOBA.

## *Background*

### I. *Firefighter Bice's Death*

On October 18, 1996, Martha Bice responded to a forest fire in her capacity as a volunteer firefighter for the West Etowah Fire Department, Altoona, Alabama. She fought the fire in heavy smoke for approximately two and a half hours. Immediately after her prolonged exposure to the fire, Firefighter Bice complained of inhaling too much smoke, of nausea, and of chest pains. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 2–3; Administrative Record ("AR"), Vol. 1, Tab 4. Firefighter Bice received emergency care from paramedics, was taken to a county hospital, and then was airlifted to Baptist Medical Center, a hospital in Birmingham, Alabama. CSUF ¶ 7.

Hospital personnel diagnosed Firefighter Bice as having suffered a myocardial infarction, commonly known as a heart attack. She received a temporary pacemaker and then underwent cardiac catheterization with angiography. CSUF ¶ 5. Physicians also became aware for the first time that Firefighter Bice suffered from pre-existing heart disease, though any potential contribution to her heart attack is uncertain. Over the first four days of her hospitalization, Firefighter Bice also suffered from respiratory failure, hempotysis (coughing up blood) and pulmonary edema (excess fluid in the lungs) and received emergency care accordingly. CSUF ¶ 8; AR, Vol. 1, Tab 6 (Discharge Summary).

On November 4, 1996, Firefighter Bice was discharged from the hospital in the hopes that she would recover and regain strength for further heart surgery at a later date. CSUF ¶ 9. On November 22, 1996, she was readmitted to the Baptist Medical Center because of chest pain and underwent a quadruple coronary bypass grafting procedure. CSUF ¶ 17. Firefighter Bice died two days after surgery at the age of 59. The exact cause of Firefighter Bice's death remains uncertain, and no autopsy was performed. CSUF ¶ 20.

The evidence in this case lends itself to two competing theories of Firefighter Bice's death. The Plaintiff has provided a variety of evidence, including expert medical opinions, that supports the view that the smoke and carbon monoxide inhaled by his wife at the forest fire was sufficient to prompt the heart attack which led to her death. The Defendant points to much of the same evidence as well as its own expert testimony to support the position that Firefighter Bice's death was instead caused by her pre-existing heart disease.

## II. *Exposure to Carbon Monoxide*

Firefighter Bice made other members of the West Etowah Fire Department aware of her "chest pains, nausea, shortness of breath, and smoke inhalation" as reported in the Department's "Emergency Medical Report." AR, Vol. 1, Tab 17 (Emergency Medical Report). In addition to Firefighter Bice's own testimony, two firefighters from the West Etowah Department provided affidavits attesting to Firefighter Bice's prolonged exposure to "heavy smoke" during the forest fire and her subsequent physical complaints. *Id.* (Affidavits of Fire Chief Terry Blakely and Assistant Fire Chief John Smith). The Government conceded at oral argument that Mrs. Bice inhaled carbon monoxide. Oral Argument Transcript (OA Tr.) at 83.

The dispute here is not whether Mrs. Bice inhaled carbon monoxide, but whether her carbon monoxide inhalation was a direct and proximate cause of her death. *See* BJA Response at 2 ("Whether Mrs. Bice suffered a traumatic injury fighting a fire on October 18, 1996, however, is not the deciding issue in this claim. For claimant to prevail under the Act, Mrs. Bice's smoke inhalation must have been a direct and proximate cause of her death which occurred more than one month after the smoke inhalation.").

## III. *Medical Evidence from the Hospital*

Carbon monoxide is virtually always a component of smoke. CSUF ¶ 4. It has a physical presence and causes a chemical reaction that prevents oxygen from getting into the blood and to the heart muscle. Carbon monoxide poisoning thus makes a victim more vulnerable to heart attacks. *See Bice,* 61 Fed.Cl. at 422.

Because of equipment malfunction, the hospital was unable to test for Mrs. Bice's carbon monoxide levels in blood gas tests during the first three days after her admission on October 18, 1996. As a result, there is no documentation of the exact amount of carbon monoxide in her bloodstream at or about the time of the incident. CSUF ¶ 6. A complete analysis of Mrs. Bice's blood gases, including a test of carbon monoxide levels, was finally obtained on October 21, 1996. AR, Vol. 1, Tab 6 (Blood Test Results). By this time the carbon monoxide would have passed out of her blood. These results were therefore not a measure of carbon monoxide levels at the time of her heart attack.

Other evidence from the hospital records, however, points to the role of smoke exposure and carbon monoxide inhalation in Firefighter Bice's death. In particular, Firefighter Bice suffered respiratory failure upon arriving at the hospital. Her respiratory condition was severe enough to require treatment in the form of intubation and ventilation. She also initially experienced "neurological abnormalities." AR, Vol. 1, Tab 6 (Discharge Summary). Such breathing problems and confusion are common signs of carbon monoxide poisoning.

Furthermore, the hospital diagnosed Firefighter Bice as suffering from pulmonary edema as evident from her x-rays. This condition is one of the manifestations of severe carbon monoxide poisoning. Firefighter Bice's fatal heart attack itself is also recognized as one of the more severe cardiovascular manifestations of carbon monoxide poisoning. AR, Vol. 1, Tab 6 (Harrison's Textbook of Medicine).

The death certificate correctly states that Firefighter Bice's immediate cause of death was the "heart failure" which occurred on October 18, 1996. The death certificate lists coronary artery heart disease as an underlying cause of her death. CSUF ¶ 19. However, the attending surgeon stated under oath that he believes the death certificate is erroneous or incomplete and should have also listed smoke exposure and carbon monoxide

inhalation as contributing factors. AR, Vol. 1, Tab 29 (Dr. Randleman's Affidavit). Medical experts disagree as to whether Firefighter Bice's underlying heart disease or carbon monoxide poisoning caused or significantly contributed to her death.

## IV. *Expert Medical Opinion*

The expert analyses provided by the Plaintiff and the BJA express the two opposing viewpoints surrounding Firefighter Bice's death. The expert medical opinions provided by Mr. Bice supports the theory that the smoke and carbon monoxide inhalation caused Firefighter Bice's eventual death. The forensic reports requested by the BJA from the Armed Forces Institute of Pathology ("AFIP"), on the other hand, contend that Firefighter Bice's prolonged exposure to smoke did not significantly contribute to her death in light of her pre-existing heart disease.

### A. *The Carbon Monoxide Hypothesis*

In all, Mr. Bice submitted to the BJA four affidavits given under oath from medical experts. Each opined that carbon monoxide inhalation was a substantial factor in Firefighter Bice's heart attack and subsequent death, CSUF ¶ 22, and each gave reasons for his conclusions. Doctors Randleman, Colvin, and Stetler all physically examined Firefighter Bice following the fire and up to her death. Dr. Dimick based his finding on a thorough review of her medical records.

Dr. Randleman is the board certified cardiovascular surgeon who performed Firefighter Bice's November 22, 1996, heart surgery. According to his affidavit, the death certificate was completed erroneously by one of his associates. Dr. Randleman believes that the hospital should have listed smoke exposure and carbon monoxide as additional causes of Firefighter Bice's death. Dr. Randleman further contended that "without the two hour exposure to fighting the fire, smoke, and carbon monoxide inhalation ... [Firefighter Bice] may have gone years without suffering a heart attack." AR, Vol. 1, Tab 29 (Affidavit of Dr. Randleman).

Dr. Colvin was Firefighter Bice's personal physician and examined her regularly. According to his affidavit, Dr. Colvin finds that carbon monoxide was "a most substantial factor" in causing Firefighter Bice's death. He particularly notes that Firefighter Bice had "never complained of chest pain suggestive of coronary disease" before her heart attack. AR, Vol. 1, Tab 29 (Second Affidavit of Dr. Colvin).

Dr. Stetler is the board certified cardiologist who attended Firefighter Bice. Dr. Stetler specifically weighs into his conclusion the fact that Firefighter Bice's heart had compensated for her pre-existing atherosclerotic condition over time:

> The distal segment filled well via collaterals from the left system. She had some non-critical stenosis in other arteries of the heart ... In my opinion the carbon monoxide and smoke inhalation were *as substantial factors* in the cause of Mrs. Bice's myocardial infarction as the underlying coronary disease.

AR, Vol. 1, Tab 29 (Affidavit of Dr. Stetler) (emphasis added).

Dr. Dimick has numerous qualifications in the field of treating smoke-related injuries, including his service as the Director of the Burn Unit of the University of Alabama Hospital for 27 years. While he did not personally examine Firefighter Bice, he thoroughly reviewed her medical records. Based on his extensive experience, Dr. Dimick strongly agrees with the findings of Firefighter Bice's attending doctors:

> [I]t is my opinion, to a reasonable degree of medical certainty, that the smoke that Mrs. Bice inhaled and the carbon monoxide that got into her blood stream caused additional damage to her coronary vessels and heart muscle such that she sustained her heart attack after the prolonged smoke and carbon monoxide inhalation ... *Since she was exposed to smoke and carbon monoxide inhalation for 2½ hours before any symptoms appeared, it is highly probable that the carbon monoxide inhalation was the most substantial factor at that time in causing her death.*

AR, Vol. 1, Tab 29 (Affidavit of Dr. Dimick) (emphasis added).

### B. The Pre-existing Heart Disease Hypothesis

The BJA requested that experts from the AFIP evaluate Firefighter Bice's case over the course of the proceedings. The AFIP pathologists generally expressed the opinion that Mrs. Bice "died as a result of her underlying atherosclerotic cardiovascular disease." CSUF ¶ 23. Although the pathologists may have experience with carbon monoxide related injury, the deficiencies and mistakes of their reports were reviewed in great detail by this Court's previous opinion. See Bice, 61 Fed.Cl. at 424–428.

Overall, the unsworn AFIP reports consistently fail to address or challenge the evidence of Firefighter Bice's smoke and carbon monoxide inhalation. It appears that the conclusions of both pathologists were based in part on the erroneous legal position that smoke inhalation does not constitute traumatic injury under the PSOBA regulation. Neither report adequately addressed the critical question of whether the smoke inhalation aggravated Firefighter Bice's heart condition. AR, Vol. 1, Tabs 12, 17 (Reports of Drs. Lapa and Spencer).

Dr. Steven Campman, the Chief Deputy Medical Examiner, filed a third report in light of the substantial evidence of carbon monoxide poisoning found in Mr. Bice's numerous appeals. This was the only AFIP report to engage in an analysis of Firefighter Bice's death. Dr. Campman concedes that her heart attack was "likely precipitated by the effects of fighting a fire," a concession that supports Plaintiff's case. But Dr. Campman notes that a heart attack might have occurred at any time due to the pre-existing heart disease. AR, Vol. 1, Tab 32 (Report of Dr. Campman).

The report, however, remains flawed. Dr. Campman dismisses Firefighter Bice's symptoms of carbon monoxide poisoning because they might also be symptomatic of heart attack caused by atherosclerotic disease. The report also suggests that carbon monoxide would cause only a transient heart blockage unlike the complications that lasted roughly five weeks. But much like the first two pathologists, Dr. Campman fails to address the reasoning contained in the affidavits of Firefighter Bice's doctors. Instead, the report's final conclusion rests on the incorrect premise that the presence of carbon monoxide was only "assumed" because it was "never documented" by "objective proof" such as the blood gas tests. AR, Vol. 1, Tab 32 (Report of Dr. Campman). Thus, Dr. Campman does not accept the admission conceded by the Government that Firefighter Bice did, in fact, inhale carbon monoxide.

## V. Other Evidence

On June 12, 1998, the State Board of Adjustment for Alabama awarded Mr. Bice $50,000 for the death of his wife. The award was issued pursuant to a state statute that compensates firefighters injured or killed in the line of duty and is similar, although not identical, to the federal PSOBA. See Code of Ala. § 36–30–1. The Board based its decision on a finding of facts "submitted and proven by the claimant" that "Martha Bice, Etowah County Volunteer Fire Department, died of heart failure following smoke inhalation at the scene of a fire." CSUF ¶ 21; AR, Vol. 1, Tab 15. Under PSOBA regulations, factual findings of state agencies are entitled to "substantial weight." 28 C.F.R. § 32.5.

## VI. Procedural History

### A. Administrative Proceedings

On December 8, 1997, over eight years ago, Mr. Bice first filed his claim for PSOBA benefits for the death of his wife. On July 27, 1998, the Program Director denied the claim based on the first AFIP finding that Firefighter Bice had not suffered a traumatic injury in the line of duty. AR, Vol. 1, Tab 4. Mr. Bice appealed the decision and supplied additional materials, including Firefighter Bice's medical records.

On March 11, 1999, a hearing officer again denied the death benefits. While the decision acknowledged that "stress and strain could have initiated the heart attack or aggravated the heart condition," it refused to recognize Firefighter Bice's smoke inhalation as a "substantial factor or a traumatic injury" under the regulations. AR, Vol. 1, Tab 13.

On April 17, 1999, Mr. Bice appealed this decision to the Director of the BJA. Mr. Bice submitted a copy of the decision by the State Board of Adjustment of Alabama, awarding him a state death benefit. This finding was not considered by the BJA. In his appeal, Mr. Bice specifically contested the decision that smoke inhalation did not constitute a traumatic injury. In support of his appeal, Mr. Bice provided the BJA with a copy of the "Relative Contribution of Carbon Monoxide and Heart Diseases to the Death of Public Safety Officers." 43 Fed.Reg. 41,302 (Sept. 15, 1978). This publication discusses the findings of a meeting of five leading medical experts and officials of the Law Enforcement Assistance Administration ("LEAA"). The meeting was an attempt to draft guidelines to aid in the determination of when carbon monoxide injury should constitute a "substantial factor" under the PSOBA in the death of a public safety officer. Of particular note, the guidelines did *not* make the submission of blood gas test results a requirement of recovery. *See Bice,* 61 Fed.Cl. at 426.

On July 23, 1999, the Director of the BJA issued the First Final Agency Decision denying Mr. Bice's claim for benefits. AR, Vol. 1, Tab 16. Mr. Bice requested an oral hearing, which was finally allowed on January 12, 2001. The hearing officer endorsed the findings of the third AFIP report by Dr. Campman and upheld the Director's decision to deny the benefits. AR, Vol. 1, Tab 26.

On May 28, 2002, the BJA issued its Second Final Agency Decision, which was the focus of Mr. Bice's initial case in this Court. The decision entirely disregarded the expert opinions provided by Mr. Bice because the medical experts "had no way of knowing how much or even whether Mrs. Bice actually inhaled carbon monoxide." AR, Vol. 1, Tab 37.

The Director also rejected the application of a federal regulation requiring the BJA to "resolve any reasonable doubt arising from the circumstances of the public safety officer's death" in favor of the claimant. *See* 28 C.F.R. § 32.4. The BJA refused to apply this reasonable doubt standard because it found that Mr. Bice provided only "circumstantial" or "speculative" evidence of Firefighter Bice's smoke and carbon monoxide inhalation. AR, Vol. 1, Tab 37.

### B.  *This Court's Remand Decision*

Mr. Bice appealed the BJA's final decision to this Court, and the Court issued an opinion on July 29, 2004. Because we found that the BJA "improperly disregarded evidence favorable to the Plaintiff" and "imposed evidentiary limitations" unsupported by the law, the BJA's final decision was reversed and the matter was "remanded for consideration in light of this Court's ruling." *Bice,* 61 Fed.Cl. at 422. Overall, we determined that the regulations provided a much more liberal understanding of a *prima facie* case than the BJA applied in its final decision. *See e.g. id.* at 431.

In terms of Firefighter Bice's inhalation of smoke and carbon monoxide, we found that the BJA ignored several sources of evidence, including Firefighter Bice's medical records. For example, the BJA's final decision disregarded clear medical documentation of Firefighter Bice's pulmonary edema, a symptom of severe carbon monoxide poisoning. The BJA additionally failed to consider the affidavits of firefighters who fought alongside Firefighter Bice in "heavy smoke" and responded to her initial physical symptoms. *Id.* at 433.

We questioned the BJA's determination that Mr. Bice failed to make a *prima facie* case for relief. The BJA's final decision determined that the expert medical testimony provided by Mr. Bice was "circumstantial" and gave it no weight in its consideration. We stated, however, that "circumstantial evidence is just as valid as direct evidence" and that "expert evidence qualifies as evidence." *Id.* at 433–34.

We found error in the BJA's failure "to give substantial weight to the factual findings of pertinent State and Federal agencies." *Id.* at 437. In particular, the BJA decision entirely disregarded the benefits award of the Alabama State Board, which found that Firefighter Bice "died of heart failure following smoke inhalation at the scene of a fire." AR Vol. 1, Tab 15.

We also found that the BJA failed to adhere to the "reasonable doubt" provision of

its regulations. We stated that the "BJA must apply [on remand] the reasonable doubt provision to all questions of fact for which prima facie evidence in favor of plaintiff exists." *Bice,* 61 Fed.Cl. at 437. Thus, we determined that the evidence presented by Mr. Bice made inapposite the BJA's comparisons to other cases like *Tafoya v. United States,* 8 Cl.Ct. 256 (1985) and *Morrow v. United States,* 227 Ct.Cl. 290, 647 F.2d 1099 (1981). *Bice,* 61 Fed.Cl. at 436–37.

Finally, we noted the BJA's repeated references to "objective" as opposed to "circumstantial" evidence. We read this as a tacit, if not explicit, requirement that the BJA would accept only blood gas test results as competent evidence on the causation role of carbon monoxide. *Id.* at 431. We rejected such an exclusive limitation on evidence as not mandated either by statute or regulation. *Id.* ("Most assuredly, the regulations do not specify that certain kinds of evidence are necessary to prove a claim; and certainly do not require objective or 'empirical' evidence in order to prove exposure to smoke and carbon monoxide.") (citing 28 C.F.R. §§ 32.21, 32.2).

### C. *BJA Response to Remand*

On December 17, 2004, the BJA issued its "Response to Re-determination Remand" from this Court. The BJA again denied Mr. Bice his claim for benefits and found that he "failed to establish a prima facie case that Mrs. Bice inhaled a lethal quantity of carbon monoxide." BJA Response at ¶ 15. On remand, the BJA takes a more extreme position than it had in its previous final decision:

> To prevail in the instant case, claimant *must* demonstrate that Mrs. Bice inhaled sufficient quantities of carbon monoxide ... Unfortunately, claimant has not produced *any* evidence, either scientific or circumstantial, to establish this material fact.

*Id.* at ¶ 3 (emphasis added).

The BJA further explained that Plaintiff had to prove that Mrs. Bice inhaled a "lethal quantity" of carbon monoxide. The BJA indicated that this could only be shown through scientific data or an autopsy:

> Under the PSOB regulations, BJA cannot, and does not, require scientific or 'objective' evidence for each and every claim. The facts of some claims, however, *require the submission of medical evidence* by a claimant in order to establish a prima facie case.

*Id.* at ¶ 9 (emphasis added).

The BJA's statements are notable in at least three respects. The BJA introduces for the first time the concepts of "lethal quantity" and "medical evidence." The BJA provides no explanation, reference, or support for these new elements. It rejects as not competent evidence—be it direct, circumstantial, or opinion—each of the Plaintiff's submissions.

The BJA again rejects the expert medical opinion provided by Mr. Bice because none of the medical experts "provided any specific facts or concrete data to support their conclusory statement." BJA Response at ¶ 8. The BJA stated that the opinions were based upon "assumption," "speculation," and "conjecture," and compared it again to the evidence provided in *Tafoya. Id.* at ¶ 9. The BJA continues to make numerous comparisons to *Tafoya* and *Morrow. Id.* at ¶¶ 11, 13.

The BJA also found that it did not reach the application of the reasonable doubt rule because it concluded that Plaintiff did not establish a prima facie case for relief. Therefore, according to the BJA, there was no evidence that could create any reasonable doubt in Plaintiff's favor. *Id.* at ¶ 15.

On March 7, 2006, the Plaintiff filed a brief challenging the BJA decision upon remand and seeking judgment on the administrative record. On July 13, 2006, the Court held a second oral argument on the matter.

### *Discussion*

### I. *The PSOBA*

The PSOBA provides, "In any case in which the Bureau of Justice Assistance ... determines ... that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit[.]" 42 U.S.C. § 3796(a). At the time of Mrs. Bice's death on November 24, 1996, the PSOBA

survivor benefit available was $100,000, as adjusted for inflation according to the Consumer Price Index for all Urban Consumers on October 1 of every year, beginning in 1988. *See* Pub.L. No. 100–690, § 6105 (1988) (codified, as amended, at 42 U.S.C. §§ 3796(a), (h) (1996)).

A plaintiff seeking payment under the PSOBA must demonstrate that the deceased (1) was a public safety officer, (2) suffered a "personal injury" within the meaning of the PSOBA, (3) suffered the injury while "in the line of duty," and (4) died as a "direct and proximate result" of her personal injury. The only contested issue in this case is whether Mrs. Bice's smoke and carbon monoxide inhalation, which qualifies as a personal injury under the PSOBA, was a "direct and proximate cause" of her death.

As a remedial statute, the PSOBA "should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes." *Demutiis v. United States,* 48 Fed.Cl. 81, 86 (2000); *see also Balt. & Phila. Steamboat Co. v. Norton,* 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932) (stating that such remedial laws "are deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results") (citations omitted). "A liberal construction is ordinarily one which makes the statutory rule or principle apply to more things or in more situations than would be the case under a strict construction." 3 N. Singer, Sutherland Statutory Construction § 60.1 (6th ed.2001).

## II. *Jurisdiction and Standard of Review*

### A. *Motion for Judgment on the Administrative Record*

Although Plaintiff's motion was not captioned as such, the parties agreed that this case is before the Court on a motion for judgment on the administrative record pursuant to the former Rule 56.1 of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Pl. Br. at 12; Def. Br. at 3–4. During the pendency of this motion, the United States Court of Federal Claims adopted amendments to several provisions of the RCFC, replacing the former RCFC 56.1 with the new RCFC 52.1, entitled "Motions Respecting the Administrative Record." *See* Notice of Adoption of Amendments to Rules of the United States Court of Federal Claims, 2006 U.S. Order 31 (June 20, 2006).

The standard of review for a motion for judgment on the administrative record under RCFC 52.1 remains unchanged from the standard under the now-repealed RCFC 56.1. *See Groff v. United States,* 72 Fed.Cl. 68, 72–73 (2006). In deciding motions for judgment on the administrative record, the court is allowed to resolve questions of fact "by weighing the evidence present in the administrative record, as properly supplemented." *Six v. United States,* 71 Fed.Cl. 671, 679 (2006) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir. 2005)).

### B. *Review of Decision of the BJA*

This Court may only hear claims brought against the United States if Congress specifically and unambiguously waived the government's sovereign immunity for such a suit. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Under the Tucker Act, this Court has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). However, the Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). To properly invoke this Court's jurisdiction under the Tucker Act, a plaintiff must "identify a substantive right for money damages against the United States separate from the Tucker Act." *Todd v. United States,* 386 F.3d 1091, 1094 (Fed. Cir.2004).

Plaintiff seeks review of the BJA's redetermination on remand of its final decision denying Plaintiff survivor benefits under the PSOBA. The PSOBA qualifies as "a separate

statute [that] establishes the right that allegedly has been breached." *Fisher v. United States,* 402 F.3d 1167, 1171 (Fed.Cir.2005). Therefore, this Court has jurisdiction to review the final decision of the BJA.

■ "Judicial review of a BJA denial of death benefits under the [PSOBA] is limited to three inquiries: '(1) whether there has been substantial compliance with statutory [sic] and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was substantial evidence supporting the decision.'" *Chacon v. United States,* 48 F.3d 508, 511–12 (Fed.Cir.1995) (quoting *Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099 (1981)).

### III. *Analysis*

A court may set aside an agency decision if it determines that the agency acted in an arbitrary and capricious manner. The arbitrary and capricious standard is taken from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994). In *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. 814 (citations omitted).

### A. *Agency Obligation to Comply With This Court's Remand Order*

■ We held in our earlier opinion that the BJA had violated the applicable statute and regulations by improperly disregarding evidence favorable to Plaintiff and imposing impermissible evidentiary limitations. We remanded the case to the BJA for a redeter-

mination of Plaintiff's claim consistent with our ruling. *Bice,* 61 Fed.Cl. at 437.

As a rule, proceedings on remand "should be in accordance with both the mandate of the appellate court and the result contemplated in the appellate opinion." 5 Am. Jur.2d § 782 (West 2005). Furthermore, on remand, the trial court or agency must implement "both the letter and the spirit of the mandate ... taking into account the appellate court's opinion, and the circumstances it embraces." *Id.*

The BJA is bound to comply with our instructions on remand. *See In re Wella A.G.,* 858 F.2d 725, 728 (Fed.Cir.1988) (citing *Federal Power Comm'n v. Pacific Co.,* 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180 (1939)). If the BJA disagreed with our interpretation of the statute and regulations, the BJA was required to challenge our decision through the appeals process. *See S. Cal. Edison Co. v. United States,* 226 F.3d 1349, 1355 (Fed.Cir.2000) ("[W]hen a court determines that an agency's statutory or regulatory interpretation is unreasonable or contrary to law, and remands the matter to the agency to implement the court's alternative interpretation, we have held that the remand order is final and appealable."). The BJA was not free simply to disregard our decision and apply its own interpretation of the statutes and regulations on remand.

We find that the BJA committed prejudicial error by failing to follow our instructions on remand. We set aside and vacate the BJA's decision on remand on this ground. *See Butler Lime and Cement Co. v. Occupational Safety and Health Review Comm'n,* 658 F.2d 544, 551 (7th Cir.1981). Nevertheless, in the following sections we examine the BJA's redetermination in detail. We conclude that the BJA acted in an arbitrary and capricious manner by again disregarding evidence favorable to Plaintiff and imposing new impermissible evidentiary burdens on him. We therefore reverse and vacate the BJA redetermination on these grounds as well.

### 1. *Disregard of Plaintiff's Evidence*

■ In our previous opinion, we held "that the BJA improperly disregarded evidence fa-

vorable to the Plaintiff, in violation of the [PSOBA] and regulations." *Bice,* 61 Fed.Cl. at 422. In its Second Final Decision, the BJA asserted that the evidence relied upon by Plaintiff was "circumstantial," and therefore "no evidence is offered by the claimant to show that Mrs. Bice actually inhaled a quantity of carbon monoxide sufficient to cause a heart attack." *See* AR Vol. 1, Tab 37 (Second Final Decision) at 5. In our previous opinion, we held that the BJA committed legal error in disregarding Plaintiff's so called "circumstantial evidence." *Bice,* 61 Fed.Cl. at 434.

On remand, the BJA again disregarded Plaintiff's medical experts' opinions, the firefighters' affidavits, Mrs. Bice's complaints of her symptoms, her pulmonary edema diagnosis, and the State of Alabama Board of Adjustment compensation award. The BJA's failure to consider these relevant factors on remand is arbitrary and capricious. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

#### a.) *Plaintiff's Medical Experts' Opinions*

On remand, the BJA again rejected out of hand Plaintiff's medical experts' opinions. This time, however, the BJA did not reject the experts' opinions as incompetent "circumstantial evidence." Instead, the BJA went even further to state that the experts' opinions failed to meet the standards of Federal Rule of Evidence ("FRE") 702. "The affiants merely assume, rather, without offering any facts or data or other foundation, that Mrs. Bice inhaled a lethal dose of carbon monoxide in the October 18, 1996, fire." BJA Response at ¶ 8. The BJA stated that the experts' opinions were merely "conclusory" and did not constitute evidence at all. *Id.*

First, we reiterate that our previous opinion is the law of the case and binding on the BJA. In that opinion we held that Plaintiff's experts' opinions constituted competent evidence that should have been considered by the BJA. *Bice,* 61 Fed.Cl. at 433. We stated:

> Director Nedelkoff discounts these expert opinions as not being "evidence." This is, of course, not true. As a general proposi-

tion, expert evidence qualifies as evidence. Moreover, a "Commentary" which appears directly following the PSOBA regulations in the Federal Register (but not in the Code of Federal Regulations) states that "[i]f appropriate, the opinions of other pathologists or cardiologists will be solicited."

*Id.* (internal citations omitted). We held that the BJA committed legal error by ignoring this evidence. We instructed the BJA to accord Plaintiff's medical expert testimony the proper weight on remand. *Id.* at 434.

Moreover, the BJA is incorrect in its determination that Plaintiff's medical experts' opinions do not meet the standards of FRE 702 because they did not base their opinions on quantitative evidence of the exact amount of carbon monoxide inhaled by Mrs. Bice. *See* BJA Response at ¶ 12. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In short, FRE 702 does not impose upon the experts the evidentiary burdens that the BJA claims it does. Plaintiff's experts are not required to base their opinions on any quantitative data showing the levels of carbon monoxide inhaled by Mrs. Bice. In fact, the Advisory Committee Notes to FRE 703, which further define the "facts or data" upon which experts may rely, states that firsthand observation of the expert witness is one of the sources of "facts or data" and cites a treating physician as an example. Fed.R.Evid. 703, Advisory Committee Note.

Three of the four medical experts put forth by Plaintiff personally attended Mrs. Bice, and the fourth medical expert reviewed Mrs. Bice's medical records. The BJA's conclusion that the statements of four medical ex-

perts are "conclusory" and "contain no factual bases or data" is simply contrary to the Administrative Record. Each of the doctors gave explanations for their conclusions based on facts they obtained through either personal observation or review of medical records. The BJA's requirement that Plaintiff's experts base their opinions on quantitative or "scientific" data is created out of whole cloth and is nowhere authorized by the PSOBA, its implementing regulations, or the Federal Rules of Evidence.

Furthermore, the BJA's application of this requirement demonstrates its absurdity. By refusing to accept the firsthand observations of three examining physicians as "medical" or "scientific" evidence, the BJA effectively discounts *any* medical evidence that is not produced by machine.

### b.) *Firefighters' Affidavits*

In its Second Final Decision, the BJA failed to consider as evidence two affidavits of firefighters who fought alongside Mrs. Bice on October 18, 1996. In fact, nowhere in the Second Final Decision did the BJA even mention these affidavits. *See* AR, Vol. 1, Tab 37 (Second Final Decision). Both Firefighter Terry Blakely, Fire Chief of the West Etowah County Volunteer Fire Department, and Firefighter John D. Smith, the Assistant Fire Chief, stated that the firefighters, including Mrs. Bice, fought in "heavy smoke" for two and a half hours before Mrs. Bice "complained of getting too much smoke, nausea and chest pain." AR, Vol. 1, Tab 17 (Affidavits of John D. Smith and Terry Blakely).

In our previous opinion, we found that the firefighters' affidavits constituted evidence of Mrs. Bice's smoke inhalation. *Bice*, 61 Fed. Cl. at 433. The BJA mentioned these affidavits only twice on remand, BJA Response at ¶¶ 5, 14. Beyond merely stating that the BJA "never disputed" that Mrs. Bice inhaled smoke during the fire, there is no indication that the BJA ever considered the firefighters' statements in its determination.

The firefighters' affidavits provide more than just evidence that Mrs. Bice inhaled smoke while fighting the fire. The firefighters also stated that Mrs. Bice complained of nausea and chest pains at the scene of the fire. AR, Vol. 1, Tab 17 (Affidavits of John D. Smith and Terry Blakely). Both of these symptoms are common manifestations of substantial carbon monoxide poisoning. AR, Vol. 1, Tab 6 (Harrison's Textbook of Medicine). Although the Government has conceded that Mrs. Bice did inhale carbon monoxide, OA Tr. at 83; *accord* BJA Response at ¶ 5, the Government argues that nothing in the firefighters' affidavits demonstrates whether Mrs. Bice inhaled sufficient carbon monoxide to have substantially contributed to her death. Def. Br. at 9; *see also* BJA Response at ¶ 10 ("Unfortunately, the claimant has not produced *any* evidence, either scientific or *circumstantial,* to establish this material fact.") (emphasis added).

On this point, the Government is incorrect. The firefighters' affidavits constitute evidence that Mrs. Bice inhaled a sufficient amount of carbon monoxide to cause her to immediately suffer from symptoms of carbon monoxide poisoning. This evidence supports a finding that Mrs. Bice's carbon monoxide inhalation was a proximate cause of her heart attack the day she fought the fire. It further supports a finding that the carbon monoxide poisoning substantially contributed to her subsequent heart problems leading up to and resulting in her death. The BJA completely failed to consider the firefighters' affidavits as evidence of the significant amount of carbon monoxide inhaled by Mrs. Bice.

### c.) *Pulmonary Edema*

Upon arriving at the hospital within hours of fighting the fire, Mrs. Bice was diagnosed as suffering from pulmonary edema. AR, Vol. 1, Tab 6 (Discharge Summary). In our earlier opinion, we noted that the BJA completely ignored this medical diagnosis in its Second Final Decision. We instructed the BJA to give proper weight to this evidence on remand. *Bice*, 61 Fed.Cl. at 433, 434.

In its redetermination on remand, the BJA again completely failed to even mention that Mrs. Bice was diagnosed as having suffered from pulmonary edema, let alone afford this evidence the proper weight in its analysis.

This is especially odd, considering that the BJA stated that "[t]he dearth of evidence that the deceased inhaled lethal quantities of carbon monoxide makes this claim indistinguishable from *Morrow[.]*" BJA Response at ¶ 11 (citing *Morrow v. United States*, 227 Ct.Cl. 290, 647 F.2d 1099 (1981)). In *Morrow*, the Hearing Officer relied on the fact that Mr. Morrow had not been diagnosed as having suffered from pulmonary edema in his determination that carbon monoxide inhalation was not a direct and proximate cause of Mr. Morrow's death. 647 F.2d at 1102. The Hearing Officer stated:

> "It can be assumed from (the) evidence and from the information contained in the referenced publications, that Mr. Morrow did inhale sufficient carbon monoxide to block off consciousness of his activities following his exit from the fire room, but since he later recovered full consciousness, *and no edema was reported by Dr. Sterne at the time of examination in the emergency room* it can be assumed further that the effects of the carbon monoxide on his body were not sufficient to cause real respiratory problems."

*Id.* at 1102 (quoting Hearing Officer's Decision) (emphasis added).

The Government attempted to explain the BJA's failure to consider the pulmonary edema diagnosis in a footnote, which stated:

> [T]he [experts'] affidavits simply do not link said pulmonary edema to proof that Mrs. Bice suffered fatal carbon-monoxide poisoning. To the contrary, if such pulmonary edema were such a conclusive marker of fatal carbon monoxide poisoning, we would expect the affidavits would have drawn such a link. Indeed ... the symptoms ... consistent with carbon monoxide poisoning (which included the pulmonary edema) were also consistent with Mrs. Bice's "myocardial infarction caused by artherosclerosis."

Def. Br. at 6–7, n. 5 (citations omitted).

This explanation is flawed for two reasons. First, it should be noted that while these may be valid arguments for the BJA to make in determining how much weight to give the pulmonary edema diagnosis, they do not absolve the BJA of its obligation to consider the diagnosis in the first place. Second, there is nothing in the BJA Response or in the Administrative Record that suggests the BJA did, in fact, determine that the pulmonary edema diagnosis should not be afforded any weight for the reasons stated by the Government in its brief. Rather, the complete absence of any reference to the pulmonary edema diagnosis in the BJA Response indicates that the BJA did not consider this evidence in making its redetermination, despite our instructions to do so.

### d.) *The State of Alabama Award*

In its Second Final Decision, the BJA did not mention that the Alabama State Board of Adjustment awarded Plaintiff $50,000 in compensation, under a statute similar in purpose to the PSOBA. In doing so, the BJA failed to "give substantial weight to the evidence and findings of fact presented by State, local, and Federal administrative and investigative agencies," as required by 28 C.F.R. § 32.5. The BJA attempted to explain this omission by claiming that Plaintiff had not presented the evidence to the hearing officer. *See Bice*, 61 Fed.Cl. at 434. We found that this argument was contradicted by the Administrative Record, and that "[t]he Board's failure to give the required weight to this award, or even weight [sic] to refer to it, is independent reversible error." *Id.*

On remand, the BJA stated that the only factual finding of the Alabama State Board of Adjustment to which it must give weight is that "Mrs. Bice 'died of heart failure *following* smoke inhalation at the scene of a fire.'" BJA Response at ¶ 14 (quoting AR, Vol. 1, Tab 15 (State of Alabama Award)). The BJA argued that the factual findings of the Alabama State Board of Adjustment are not useful in determining whether Plaintiff is entitled to benefits under the PSOBA. The BJA explained that the Alabama State Award did not "address whether Mrs. Bice inhaled carbon monoxide, much less whether Mrs. Bice inhaled such quantities of carbon monoxide on October 18, 1996, to make smoke inhalation a direct and proximate cause of her death." BJA Response at ¶ 14. This argument has two faults.

First, the Alabama statute is admittedly broader in scope than the PSOBA. It does not require the injury to be a "traumatic injury" as defined by the PSOBA. But, it is undisputed in this case that Mrs. Bice's carbon monoxide inhalation qualifies as a "traumatic injury." That the Alabama State Award described Mrs. Bice's injury as "smoke inhalation" rather than "carbon monoxide inhalation" does not change this fact.

Second, the BJA's argument ignores the fact that the Alabama statute requires a direct causal connection between injury and death. Code of Ala. § 36–30–2 (Compensation will be awarded to a fireman who "is killed ... or dies *as a result of* injuries received while engaged in the performance of his duties.") (emphasis added). Thus, in order for the Alabama State Board of Adjustment to make a compensation award, it must have determined that there was a causal connection between Mrs. Bice's smoke inhalation and her death. The Alabama statute's requirement of a causal connection defeats the BJA's contention that the Alabama State Board of Adjustment's use of the word "following" was to be given only the sequential definition of the term. The BJA consequently must afford appropriate weight to the Alabama State Board of Compensation's factual finding that there was a causal connection between Mrs. Bice's smoke inhalation and her death.

The BJA also argues that it is not required to give the fact that the Alabama State Board of Adjustment awarded benefits to Plaintiff substantial weight because the award of benefits is a legal finding. BJA Response at ¶ 14. While this statement is correct as a general proposition, the BJA must give weight to the underlying factual findings Alabama made in its decision to award benefits to Plaintiff.

### 2. *Unauthorized Evidentiary Limitations*

We held in our previous opinion that the BJA also "imposed evidentiary limitations unsupported by regulation or statute," when it required Plaintiff to produce "objective" or "empirical" evidence and disregarded Plaintiff's "circumstantial evidence." *Bice,* 61 Fed.Cl. at 422. On remand, the BJA again imposed the impermissible evidentiary requirement that Plaintiff produce "quantitative" evidence. The BJA this time disregarded Plaintiff's medical experts' opinions by requiring that they be based on "data." The BJA once again abused its discretion when it imposed, on remand, the same evidentiary requirements, substituting "quantitative" for "objective" or "empirical."

### a.) *"Quantitative" Evidence*

■ The PSOBA regulations define "evidence" in the context of a hearing as follows:

> In conducting the hearing, the hearing officer shall not be bound by common law or statutory rules of evidence, by technical or formal rules or procedures, or by Chapter 5 of the Administrative Procedure Act, but must conduct the hearing in such a manner as best to ascertain the rights of the claimant.

28 C.F.R. § 32 (Appendix). As we stated in our first opinion,

> By this [definition] we understand that the strict rules of evidence do not apply, and that the program will be liberal in its acceptance of a claimant's proffers of support. Most assuredly, the regulations do not specify that certain kinds of evidence are necessary to prove a claim; and certainly do not require objective or "empirical" evidence in order to prove exposure to smoke and carbon monoxide.

*Bice,* 61 Fed.Cl. at 431 (citations omitted). In its Second Final Decision, the BJA repeatedly cited the lack of "objective" or "empirical" evidence proving Mrs. Bice died as a direct and proximate result of carbon monoxide inhalation. *See* AR, Vol. 1, Tab 37 (Second Final Decision). By disregarding Plaintiff's "circumstantial" evidence and repeatedly referring to the need for "objective" or "empirical" evidence, "the BJA imposed an unauthorized evidentiary requirement on the claimant." *Bice,* 61 Fed.Cl. at 431. We remanded the case to the BJA with instructions to correct this error.

On remand, the BJA once again imposed the same unauthorized evidentiary burdens

on Plaintiff, albeit by using different labels. The BJA stated:

> Under the PSOB regulations, BJA cannot, and does not, require scientific or 'objective' evidence for each and every claim. The facts of some claims, however, *require the submission of medical evidence* by a claimant in order to establish a prima facie case.

BJA Response at ¶ 9 (emphasis added). The BJA provided no citation or support for its statement that some claims "require the submission of medical evidence." *See id.* While "medical evidence" is not explicitly defined by the BJA, it is clear from context that the BJA is again requiring Plaintiff to produce quantitative evidence of Mrs. Bice's carbon monoxide levels.

The BJA has merely substituted a requirement that Plaintiff produce quantitative evidence for its previous requirement of "objective" or "empirical" evidence. *See, e.g.,* BJA Response at ¶ 8 ("To prevail in the instant case, claimant *must* demonstrate that Mrs. Bice inhaled sufficient quantities of carbon monoxide[.]") (emphasis in original); *id.* at ¶ 10 ("The nature of the claimant's argument, that Mrs. Bice's smoke inhalation was a substantial factor in her death, requires that the claimant submit some evidence that Mrs. Bice inhaled a large enough *quantity* of carbon monoxide to have directly and proximately caused her death.") (emphasis added); *id.* at ¶ 15 ("The claimant has provided no evidence at all that Mrs. Bice inhaled a lethal *quantity* of carbon monoxide.") (emphasis added). While the BJA states that "[t]he claimant could submit either scientific measurements or circumstantial evidence in this case," *id.* at ¶ 10, in fact the BJA disregarded all of Plaintiff's evidence bearing on the impact of the carbon monoxide and again required Plaintiff to produce conclusive scientific evidence of Mrs. Bice's carbon monoxide levels.

### b.) *Bases for Expert Opinions*

The BJA, citing FRE 702, concluded that the Plaintiff's experts did not base their opinions on sufficient facts or data and therefore their opinions were purely speculative:

> Not one of the experts base their opinion on evidence (i.e., "facts or data") that Mrs. Bice inhaled a lethal quantity of carbon monoxide. Mrs. Bice's carbon monoxide blood saturation level could have been 1 percent or 50 percent. No autopsy was conducted to confirm Mrs. Bice's cause of death.

BJA Response at ¶ 12. At oral argument, counsel for the Government repeatedly argued that Plaintiff's experts did not "explain" the reasoning behind their conclusions. OA Tr. at 70–71, 75, 85–86.

The BJA derived its quantitative evidence requirement from the "facts and data" language of FRE 702. However, the BJA decision did not refer to FRE 703, which specifically defines "Bases of Opinion Testimony by Experts," including the phrase "facts and data" found in FRE 702. That Rule explains in part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed.R.Evid. 703. In addition, FRE 705 states:

> The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Fed.R.Evid. 705.

It is clear from the Rules that an expert's opinion *is* evidence, whether or not the underlying facts or data are ever disclosed to the trier of fact, and whether they are independently admissible. Furthermore, the bases for the experts' opinions in this case are sufficient. Each explained the reasons for his opinion. They based their opinions on direct observation of Mrs. Bice and on her records. This is the type of information reasonably relied upon by experts in the

medical field. Indeed, in the Advisory Committee Notes to FRE 703, the first example of an appropriate basis for expert testimony is the firsthand observation of a patient by a doctor. Fed.R.Evid. 703, Advisory Committee Note.

Plaintiff's experts formed opinions and inferences based upon appropriate facts and data, and their opinions are admissible evidence under Rules 702 and 705. The Board's dissatisfaction with the experts' opinion evidence goes to the weight to be afforded their statements. That presumes impeachment, but does not diminish their value as part of Plaintiff's evidence supporting a *prima facie* case.

### 3. *Comparisons to Tafoya*

In our earlier opinion, we stated that the BJA's comparison of the facts in this case to *Tafoya v. United States,* 8 Cl.Ct. 256 (1985), "cannot withstand analysis." *Bice,* 61 Fed. Cl. at 432. In *Tafoya,* there was absolutely no evidence to support any aspect of the theory of Officer Tafoya's death. *Tafoya,* 8 Cl.Ct. at 266. The offered theory was based entirely on speculation and conjecture. *Id.* at 266–67. As we stated in our earlier opinion, given the volume of evidence Plaintiff presented to support his claim, "[t]he totally speculative scenario presented in Tafoya cannot be equated to the evidence that supports Mr. Bice's benefits claim." *Bice,* 61 Fed.Cl. at 433.

The BJA again made comparisons between Plaintiff's case and *Tafoya* in its redetermination. The BJA stated that "[t]he expert opinions submitted in this claim bear resemblance to the expert opinion submitted in *Tafoya,"* and that "the claimant's expert submissions are similarly based primarily on speculation and conjecture." BJA Response at ¶ 12. The Government argued that the expert evidence presented by Plaintiff is comparable to that in *Tafoya* because the affidavits do not explain how the evidence caused the experts to believe that carbon monoxide was a substantial factor in Mrs. Bice's death. Def. Br. at 6. That is a complete misreading of the affidavits—each of the affidavits gives reasons for the expert's conclusions.

Any challenges to how the experts arrived at their conclusions are appropriate questions on rebuttal or cross-examination, but do not compel a finding that the opinions are "speculative" and "based on conjecture." Plaintiff has produced evidence, such as Mrs. Bice's statements, the firefighters' affidavits, and Mrs. Bice's medical records, that tends to support the medical experts' reasoning and conclusions. It is improper for the BJA to compare Plaintiff's claim to *Tafoya,* where there was no evidence whatsoever to support the theory about Officer Tafoya's death.

### B. *Plaintiff's Prima Facie Case*

Under ordinary circumstances, a reviewing court's responsibility is limited to assessing the legal sufficiency of an agency's procedures and findings. The court is not expected to displace the agency in its responsibility to render a decision on the merits. In this case, however, the BJA has persisted in the same errors we found in our earlier review, and has shown a complete disregard for this Court's reviewing authority.

There have been several recent cases in which this Court has held that the BJA committed fatal errors. The Court subsequently made its own factual findings. *See, e.g., Groff v. United States,* 2006 WL 2079108 (Fed.Cl. July 27, 2006) (Bush, J.) (holding that the BJA failed to comply with the PSO-BA and its regulations; determining that the deceased officer was serving a public agency in an official capacity); *Messick v. United States,* 70 Fed.Cl. 319, 332 (2006) (Horn, J.) (finding that the deceased fireman qualified as a public officer under the PSOBA who died in the line of duty; concluding that "the BJA's decision to deny benefits … was an arbitrary exercise of its authority"); *Hillensbeck v. United States,* 69 Fed.Cl. 369 (2006) (Braden, J.) (holding that the BJA's determination did not comply with Congress' definition of "public safety officer"; finding that the deceased officer qualified as a public safety officer under the regulations); *Cassella v. United States,* 68 Fed.Cl. 189, 195 (2005) (Futey, S.J.) (finding that the deceased officer died in the line of duty after holding that the BJA applied an invalid regulation in its determination); *Hawkins v. United States,*

68 Fed.Cl. 74, 84 (2005) (Braden, J.) (determining "as a matter of fact and law" that the deceased officer was a law enforcement officer who died in the line of duty); *Davis v. United States*, 50 Fed.Cl. 192, 211 (2001) (Hewitt, J.) (finding that, on remand, the BJA did not substantially comply with the PSOBA and regulations; determining that the deceased officer was killed in the line of duty).

In each of these cases, the court awarded benefits to the plaintiffs directly. Only in *Davis v. United States*, did the Court first remand the case to permit the BJA an opportunity to correct its own error. We, too, have already given the BJA an opportunity to correct its errors on remand. The BJA disregarded our instructions and again failed to comply with the PSOBA. We have considered the alternative of a second remand, but we labor under no delusion that the BJA will be faithful to the letter and spirit of a second remand. Consequently, we make our own factual analysis and findings.

### 1. *Elements of a Prima Facie Case*

A *"prima facie* case" is defined by Black's Law Dictionary as "a party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Black's Law Dictionary* 1228 (8th ed.2004). To successfully establish a *prima facie* case, Plaintiff must produce enough evidence to allow the fact-trier to infer that Mrs. Bice's carbon monoxide inhalation was a "direct and proximate" cause of her death.

The PSOBA regulations define "direct and proximate" to mean "that the antecedent event is a substantial factor in the result." 28 C.F.R. § 32.2(d). The Commentary to the Federal Register promulgation of the 1977 PSOB Regulation provides:

> where an officer suffering from heart disease, such as arteriosclerosis, has sustained a traumatic injury and died of a 'heart attack,' a benefit will be paid only if the injury is determined to be a substantial factor in the officer's death

42 Fed.Reg. 23,260 (May 6, 1977). Therefore, Plaintiff must produce enough evidence to infer that Mrs. Bice's carbon monoxide

inhalation on October 18, 1996, was a substantial factor in her death on November 24, 1996. The operative phrase—"substantial factor"—has never been defined.

In 1977, the General Counsel of the LEAA, the predecessor to the BJA and the Office of Justice Programs, offered the following opinion as to when a traumatic injury is a substantial factor in an officer's death in circumstances in which the officer suffered from a pre-existing condition that may have also contributed to her death:

> Generally, you should consider a traumatic injury a "substantial factor" in an officer's death when ... (2) the injury contributes to the officer's death to as great a degree as any other contributing factor, such as pre-existing chronic, congenital, or progressive disease.

*Morrow*, 647 F.2d at 1100 (quoting Legal Opinion as to the PSOB Program, Op. General Counsel of LEAA (September 12, 1977)).

In *Morrow*, the Court of Claims stated that "[w]e make no holding as to the propriety of LEAA General Counsel's particular construction of the term 'substantial factor'— which strikes us as somewhat cramped[.]" 227 Ct.Cl. at 297, n. 4, 647 F.2d at 1103. In our previous opinion, we agreed with *Morrow's* view of the suggested interpretation of "substantial factor." *Bice*, 61 Fed.Cl. at 435. We rejected the Government's contention that the LEAA opinion must be given deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and determined that we did not need to reach the issue of the proper legal definition of "substantial factor" at that juncture of the case. *Id.*

In its redetermination, the BJA now has offered its definition of "substantial factor"; the BJA imposes a requirement that Plaintiff produce quantitative evidence that Mrs. Bice's inhaled "lethal quantities" of carbon monoxide levels. This evidentiary burden is greater than the LEAA General Counsel's opinion that the Government had previously argued was the applicable definition in this case. *See Bice*, 61 Fed.Cl. at 435. The new standard requires that carbon monoxide poi-

soning be the sole cause of death, and not merely a contributing factor. The BJA's new requirement is asserted without explanation, analysis, or citation to authority.

We do not endorse the LEAA definition, which we also regard as too cramped and not in keeping with the statute and its purpose. We believe that the contributing traumatic injury need only be significant. However, for purposes of this case, we believe that Plaintiff has presented enough evidence to meet even the LEAA test.

### 2. *Plaintiff's Prima Facie Case*

■ At the *prima facie* stage, we consider only whether Plaintiff has put forth enough evidence so that we might infer the disputed fact in question; we do not consider whether the opposing party has put forth any rebuttal evidence. Here, Plaintiff has put forth sufficient evidence for the fact-finder to conclude that Mrs. Bice's carbon monoxide inhalation was a substantial factor in her death. Plaintiff presented four medical experts, three of whom personally attended Mrs. Bice. The experts stated under oath that carbon monoxide was a substantial factor in her death. *See* AR, Vol. 1, Tab 29 (Affidavits of Dr. Colvin, Dr. Stetler, Dr. Dimick, and Dr. Randleman).

In addition to the four expert opinions, which alone suffice to meet Plaintiff's *prima facie* burden, Plaintiff also put forth additional evidence supporting the conclusion that Mrs. Bice inhaled a significant amount of carbon monoxide. The two firefighters' affidavits detail Mrs. Bice's complaints of nausea and chest pains, both symptoms of carbon monoxide poisoning. *See* AR, Vol. 1, Tab 17 (Affidavits of John D. Smith and Terry Blakely). Plaintiff also presented Mrs. Bice's medical records that documented her respiratory failure, "neurological abnormalities," and pulmonary edema. AR, Vol. 1, Tab, 6 (Discharge Summary). These symptoms are all common signs of carbon monoxide poisoning. To this body of evidence, we also add the Alabama award which evidences a finding of a causal connection between Mrs. Bice's smoke inhalation and her death.

### C. *The Reasonable Doubt Standard*

■ Once a plaintiff establishes a *prima facie* case, the Court then considers both parties' evidence to determine whether the plaintiff has met its evidentiary burden on the merits. Because Mrs. Bice suffered from a pre-existing heart condition at the time of her injury, the applicable evidentiary standard is set forth in 28 C.F.R. § 32.4. *See* 42 Fed.Reg. 23,254 (May 6, 1977) ("In those cases where LEAA cannot reasonably determine which factor—the heart condition or the personal injury—was the substantial causal contribution to death it [shall apply 28 C.F.R. § 32.4].") That Regulation provides:

> The Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death or permanent and total disability in favor of payment of the death or disability benefit.

28 C.F.R. § 32.4.

This lenient standard is in accordance with the PSOBA's role as a remedial statute. As we stated in our previous opinion,

> It seems only appropriate that a program designed to offer benefits to law enforcement personnel should adopt as the standard to win those benefits the same lenient burden of persuasion criminal defendants must show to win acquittal.

*Bice*, 61 Fed.Cl. at 436. There is no statute or regulation that defines "reasonable doubt" in the PSOBA context. Therefore, we look to criminal law, where this term is commonly used, for guidance. Criminal jury instructions explain the term "reasonable doubt" as follows:

> A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

1 Devitt, Blackmar & Wolff Federal Jury Practice and instructions § 10.01 (4th Ed.1992), quoting Pattern Jury Instructions of the District Judges Association of the

Eleventh Circuit, Criminal Cases, Trial Instruction No. 1.2 (1985).

Although the reasonable doubt standard is a lenient one, the burden of persuasion still rests upon Plaintiff to come forth with enough evidence to create a reasonable doubt in his favor. It is not the Government's burden to disprove Plaintiff's case beyond a reasonable doubt. Therefore, we must weigh the evidence presented by Plaintiff and by the Government and resolve any questions of fact in favor of Plaintiff. *See Davis v. United States,* 50 Fed.Cl. 192, 210 (2001).

Although the Government has presented rebuttal evidence, in the form of the three AFIP reports, we find that Plaintiff has presented sufficient evidence for the fact-finder to formulate a reasonable doubt as to whether Mrs. Bice's carbon monoxide inhalation "contributed to [Mrs. Bice's] death to as great a degree as any other contributing factor[.]" *See* Legal Opinion as to the PSOB Program. As required by 28 C.F.R. § 32.4, we must resolve this doubt in Plaintiff's favor. We therefore conclude that Plaintiff met his evidentiary burden and is entitled to survivor benefits under the PSOBA.

*Conclusion*

We thus conclude that the Bureau of Justice Assistance committed several independent, fatal errors on remand. First, the BJA disregarded our instructions on remand. Second, the BJA failed to comply with the PSOBA and implementing regulations when it ignored some of Plaintiff's evidence. Third, the BJA required Plaintiff to submit quantitative medical evidence to establish a *prima facie* case. Fourth, the BJA erred when it held Plaintiff's experts to a higher evidentiary standard than required by its regulations or the Federal Rules of Evidence. And finally, the BJA erred in concluding that Plaintiff failed to establish a *prima facie* case that Mrs. Bice died as a direct and proximate result of carbon monoxide inhalation.

We hold that Mrs. Bice's carbon monoxide inhalation while serving in the line of duty on October 18, 1996, was a "direct and proximate" cause of her death, and that Plaintiff is entitled to PSOBA survivor benefits. **We therefore REVERSE the BJA's redetermi**nation on remand and GRANT Plaintiff's Motion for Judgment on the Administrative Record.

The **Clerk of the Court is ordered to ENTER a Final Judgment,** in accordance with this Opinion, **for Plaintiff in the amount of $100,000.00,** adjusted in accordance with Pub.L. No. 100–690, § 6105 (1988) (codified, as amended, at 42 U.S.C. §§ 3796(a), (h) (1996)).

**IT IS SO ORDERED.**